NO. 5-99-0559

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

______________________________________________________________________

THE PEOPLE OF THE STATE OF ILLINOIS, )  Appeal from the

)  Circuit Court of

     Plaintiff-Appellee, )  Madison County.

)

)  No. 86-CF-605

)

MARK URIOSTE, )  Honorable

)  J. Lawrence Keshner,

     Defendant-Appellant. )  Judge, presiding.

______________________________________________________________________

JUSTICE KUEHN delivered the opinion of the court:

The miracle and wonder of DNA forensic technology has assumed an ever-increasing role in our quest for truth and justice.  At times, DNA can possess the power to decisively negate other evidence that suggests guilt and virtually establish a person's innocence.  

Because this technology is of relatively recent origin, it was not available for use at a time when many current Illinois inmates, convicted on less infallible evidence, might have employed it to confirm a claim of innocence.  In some of those cases, evidence that contains genetic material capable of testing for DNA is still intact.  Depending upon the nature of the State's proof in those cases, belated DNA testing may still have value.  It may still be capable of discovering a genetic truth that belies previously established guilt.  It may answer some inmate's persistent plea for justice.    

In recognition of the fact that new forensic testing could potentially provide the key to a cell that houses an innocent person, our legislature enacted a provision that permits postconviction DNA testing in certain cases.  See 725 ILCS 5/116-3 (West 1998).  Today, we examine the scope of that provision to determine whether Mark Urioste (Urioste) is entitled to conduct DNA tests on typed blood samples admitted into evidence during his 1987 trial. 

Following a 1987 bench trial, Urioste was found guilty but mentally ill in the stabbing death of Rebecca Rodgers.  Since then, he has been serving a 40-year prison term for murder, together with multiple concurrent prison terms for his convictions on related charges of home invasion, armed violence, and attempted criminal sexual assault.  We reviewed the 1987 proceedings and affirmed his convictions in 1990.  
People v. Urioste
, 203 Ill. App. 3d 1062, 561 N.E.2d 471 (1990).  The facts of the case are set forth in detail in that opinion.  See 
Urioste
, 203 Ill. App. 3d at 1065-70
, 561 N.E.2d at 473-76
.  We revisit only the facts necessary to an understanding of the questions presented here. 

Urioste sustained a closed head injury in 1981.  He suffered brain damage as a result of it.  Over the course of a lengthy recovery, he was able to recapture intellectual function, but he exhibited a lingering decrease in control over impulses, particularly sexual ones.  He also exhibited a decrease in control over aggressive behaviors.  During his treatment at a rehabilitation center, he gained access through the window of another patient's room and raped her.

Rebecca Rodgers died from multiple stab wounds.  She was Urioste's 20-year-old next-door neighbor.  She lived next door with her mother, Joyce Rodgers, her 16-year-old sister, Renee, and her two-year-old son.  In the early morning hours of August 8, 1986,  Joyce Rodgers was awakened by sounds from the second floor of her two-story residence.  When she went upstairs to investigate, she saw Urioste on top of Rebecca, attempting to engage in sexual intercourse with her.  Having known Urioste for his entire life, she ordered him to get off of her daughter.  He complied.  She could see that his arms and hands were covered with blood and that he was holding a knife.  Urioste approached her.  As the two of them stood face to face, he addressed her as "mom," an expression he had for years used in addressing her.  He ordered her to let him out of the front door. 

Renee Rodgers saw Urioste stumble down the stairs and run out the front door after the stabbing.  A few days before the murder, Renee had seen Urioste attempting to break into her bedroom window.  She summoned another neighbor, who confronted Urioste and asked him to explain his conduct.  Urioste responded that he had to use the restroom.  Among the several statements that Urioste made to authorities was a statement that it was Renee, not Rebecca, who he planned to engage in sex with.

An examination of the murder scene revealed that entry into the house was obtained through the bathroom window.  The window screen was removed.  Urioste's palm print was found on the bathtub, in close proximity to the point of entry.  The entry into the house mirrored how Urioste had accessed the patient's room at the rehabilitation center.

When Joyce Rodgers reported the crime and who had committed it, authorities went to the Urioste residence.  They were admitted into the house by Urioste's father, who took them to Urioste's room.  They found Urioste in bed.  He had fresh blood on his hands, neck, and clothing.  A knife, bearing fresh blood, was found on the ground along a direct track from the murder scene to Urioste's home.  At the time of the murder investigation in 1986, blood found on Urioste's underwear and on the knife was tested for blood type.  The blood was not Urioste's type O blood.  It matched Rebecca Rodgers' type A blood.  

In addition to the eyewitness testimony from people who had known Urioste for a long time, testimony that was corroborated by the fingerprint and blood matches, Urioste made incriminating statements to the police and to the judge who arraigned him.  

At the trial, Urioste entered a plea of not guilty by reason of insanity.  He countered the State's case with psychiatric testimony about his mental state at the time of the stabbing.  After hearing conflicting expert testimony on the question of insanity, the trial judge found that Urioste was mentally ill rather than insane when he committed the acts charged.  Thereafter, he imposed lengthy concurrent prison terms upon the findings of guilty but mentally ill.  

This appeal stems from proceedings that originated in August of 1999.  Urioste invoked section 116-3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/116-3 (West 1998)) and petitioned the circuit court for an order to further test the blood evidence.  His petition asserted actual innocence, as required by statute.  It sought to determine whether the blood found on Urioste's clothing and on the knife bore the genetic profile of Rebecca Rodgers.  The State responded to the petition with a request that it be dismissed.  The trial judge granted that request.  He ruled that since identity was not at issue during Urioste's  trial, Urioste lacked a statutory prerequisite for further forensic testing of the blood evidence.  This appeal ensued.  

Our review of the ruling is 
de novo
.  
People v. Savory
, 903 Ill. App. 3d 408, 412, 722 N.E.2d 220, 223 (1999), 
appeal allowed
, 188 Ill. 2d 578, 729 N.E.2d 502 (2000).
 

When our legislators enacted section 116-3, they intended to provide an avenue for convicted defendants who maintained their innocence to test available genetic material capable of producing new and dramatic evidence materially relevant to the question of innocence.  The legislature recognized that advances in scientific technology harbored the potential to correct injustice through the highly reliable use of genetics.  However, the legislature did not access postconviction forensic testing to everyone.  It limited the scope of the postconviction remedy in several ways.  Three limitations imposed upon the statute's use frame the questions raised in this appeal.  

In order to successfully open the door for further forensic testing of evidence, a convicted defendant must present a 
prime facie 
case that:

"(1) identity was the issue in the trial which resulted in his or her conviction; and

(2) the evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material aspect."  725 ILCS 5/116-3(b) (West 1998).

Provided that these two criteria are met, the circuit court is required to make a third determination.  It must decide whether "the result of the testing has the scientific potential to produce new, noncumulative evidence materially relevant to the defendant's assertion of actual innocence."  725 ILCS 5/116-3(c)(1) (West 1998).  If it finds that testing could produce evidence capable of exonerating the defendant, the circuit court is mandated to order new testing of evidence.  See 
Savory
, 309 Ill. App. 3d at 412, 722 N.E.2d at 223.

Initially, we note that Urioste's motion for DNA testing merely alleged that it was customary for the police to preserve blood samples.  There is nothing in the record from which to conclude that the necessary samples still exist, much less that a proper chain of custody has preserved their integrity.  A judgment may be sustained upon any ground warranted by the record regardless of the ground relied upon by the trial judge.  
People v. Johnson
, 188 Ill. App. 3d 147, 153-54, 544 N.E.2d 35, 39 (1989).  Therefore, we could easily affirm the dismissal order based upon Urioste's failure to comply with section 116-3(b)(2).  There simply was no showing that the evidence was intact and capable of reliable testing.

We could thus end the inquiry without reaching the issues presented on appeal. However, matters not of record were set forth in Urioste's reply brief.  The State moved to strike those matters, we took the motion with the case, and we find that the State's motion is well taken.  We strike Urioste's reference to a witness who was prepared to testify about the samples.  

Since a possibility exists that Urioste can meet the requirement of section 116-3(b)(2) and since the issues raised here are likely to arise again by the filing of another motion, we choose to address them now and put this matter to rest. 

Urioste maintains that the trial judge erred by concluding, as a matter of law, that identity was not at issue during the course of his trial.  He points to defense counsel's adversarial testing of the State's case-in-chief, which included evidence on the question of identity.  By virtue of the fact that identity was tested through the cross-examination of the State's witnesses and was at no time conceded, Urioste argues that identity was a contested issue.  He further maintains that the only question that need be answered under the requirement of section 116-3(b)(1) is whether identity was a contested issue at the trial.  He argues that even if the State produced significant evidence of the offender's identity, that would be of no import to the inquiry.  This argument stems from comments made by the assistant State's Attorney when he asked for the dismissal of Urioste's motion.  In arguing that identity was not an issue at Urioste's trial, he emphasized the overwhelming nature of the State's proof that it was Urioste who committed the crime.  

We agree with Urioste when he argues that the strength of the State's case was not a hurdle that he had to overcome in order to meet the statute's requirements for postconviction forensic testing.  In fact, everyone is in agreement that when the court is deciding whether to grant a statutory request, the statute does not call for the circuit court to revisit the trial's identification evidence in order to measure its weight.  The State readily concedes that, had the legislature intended the overwhelming nature of other evidence to be a factor in granting a motion filed pursuant to section 116-3, it would have said so.    

However, the State does not concede that Urioste is a candidate for an order to further test the blood samples admitted into evidence at the trial.  The State's position consists of three arguments–two based upon the statutory criteria that must be met and a third based upon a construction of the statutory language in a way that limits its reach.  The arguments are essentially as follows:  

1.  The question of who stabbed Rebecca Rodgers was not truly the issue at the trial.  If identity was at issue in the sense that Urioste challenged the State's case-in-

chief before tendering his defense, it ceased to be the issue when Urioste raised the affirmative defense of insanity.  

2.  Urioste's request is incapable of producing new evidence materially relevant to the question of actual innocence.  In the unlikely event that the blood found on Urioste's underwear and on the recovered knife would prove not to be Rebecca Rodgers' blood, the revelation would not exonerate Urioste.  It might cast doubt on whether the knife found and placed in evidence was the knife that he used.  It might raise new questions about how he got another person's blood on his underwear and whose blood it was.  But it would not negate sound eyewitness testimony, his palm print found at the point of entry into the home, his dual confessions, and the evidence that this murder fit a method used by Urioste to satisfy a similar sexual impulse during his rehabilitation from head injuries.  

3.  The legislature drafted section 116-3 in a way that would foreclose postconviction DNA testing to Urioste because he raised an issue other than identity during the course of his trial.  By its use of the language "identity was 
the
 issue in the trial," the legislature intended to afford postconviction DNA testing only to those whose trials tested solely the issue of who committed the crime.  The legislature's use of the word "the" rather than the word "an" meant to prohibit any defendant who contested more than the question of identity from invoking the statute's remedy.  Since Urioste raised matters other than the question of identity during his trial, he is not an intended user of the statute and is foreclosed from filing a motion under section 116-3.

We first examine the State's statutory construction of section 116-3.  We do not believe that our lawmakers intended convicted defendants who challenged identity, and nothing else during the course of their trial, to be the only users of section 116-3.  

We try to construe legislative enactments in a way that gives effect to the legislature's intent and in a way that avoids absurd results.  See 
People v. Frieberg
, 147 Ill. 2d 326, 345, 589 N.E.2d 508, 517 (1992).  The clear purpose of section 116-3 was to provide convicted defendants with a means by which to establish actual innocence through advances in forensic technology.  It was designed for the singular case where modern testing methods, not available when a conviction was obtained, could potentially discover new evidence that supports actual innocence in a decisive way.  

When the legislature required a showing that identity was the issue at the trial that led to the conviction, it sought to guard against frivolous requests by limiting the remedy to those cases where identity was truly at issue, cases where the use of the new technology could test properly preserved genetic material to either confirm or decidedly negate other identification evidence that produced the conviction.  The limitation imposed by section 116-3(b)(1) excludes from the statute's reach those defendants whose cases turned upon questions other than the question of who committed the acts charged.  The limitation is a matter of common sense.  Unless the question of identity was truly in dispute during the trial, new forensic testing would be pointless.  A lingering question of who committed the acts charged would not exist.  If a defendant did not deny committing the acts charged, but defended on other grounds, there would be no reason to test for new evidence potentially capable of exonerating.  Simply stated, our legislature wanted new forensic tests to occur only in those cases where such testing could discover new evidence at sharp odds with a previously rendered guilty verdict based upon criminal acts that the defendant denied having engaged in.

It would make no sense to allow DNA testing in cases where identity was not the issue at the trial.  Likewise, it would make no sense, and run contrary to the underlying purpose of the enactment, to restrict its remedy to that isolated case where a defendant chose to forego a test of the State's case in all its particulars, save the question of who committed the acts charged.  We can think of no reason the legislature would want to provide the given remedy and, at the same time, confine its use so narrowly.  Provided that identity was a genuine issue, contested during the trial that led to the conviction, a lingering question of actual innocence could still exist.  Even if other questions were litigated during the same trial, the identity of the crime's perpetrator would remain a question that postconviction testing with modern procedures could potentially address.  The reason the legislature provided for postconviction testing would still exist, whether identity was an isolated issue or one among several issues litigated at the trial.

Section 116-3(b)(1) was not enacted for the purpose of limiting the number of issues that potentially innocent defendants could raise and litigate during the trial.  It was made a part of the postconviction testing statute to assure its use only by those defendants who claimed at their trial that they did not commit the acts charged.  When the legislature used the language "identity was the issue at the trial," it confined the statutory remedy to trials where identity was a legitimate contested issue, but not necessarily the only issue litigated. 

The following hypothetical case provides a clearer view of why the State's statutory construct is wrong.

 Our imaginary defendant stands convicted of reckless homicide.  He has filed a motion pursuant to section 116-3 in order to test the genetic profile of blood found on the steering wheel, dash, and windshield of his car.  He wants present-day forensic experts to determine whether that profile matches his genetic profile.  

The conviction rests upon the following facts.  The defendant's unoccupied car was found involved in a fatal two-car collision.  The steering wheel, dash, and windshield were covered with fresh blood.  Human flesh, hair strands, and hair follicles were found imbedded in that blood.  Obviously, whoever was driving the unoccupied vehicle was injured in the accident and left behind genetic material.  However, at the time of the trial, forensic experts were only able to positively match the blood to the defendant's common blood type.  They were also able to say that the hair strands were consistent with samples of the defendant's hair.  

The authorities determined that the unoccupied vehicle belonged to the defendant and paid him a visit.  His home was located a short distance from the accident site.  A disoriented defendant, reeking of alcohol, answered the door.  He held a towel over a serious open wound to his forehead.  When questioned about the accident, the defendant denied being involved, disavowed knowledge of his car's whereabouts, and claimed that the wound on his forehead was the result of a blow to the head inflicted by an unknown intruder he encountered upon entry into his home after he returned from his night out on the town.

  There were many eyewitnesses who saw the defendant drive away from a nightclub located a few miles from the accident site.  The witnesses saw obvious signs of inebriation.  They watched his erratic departure toward the direction of the accident site.  A short time later, they heard distant sirens.    

At the trial, identity was put at issue.  The defendant persisted in his claim that he was the victim of a home invasion and car theft.  He remained steadfast in the assertion that he had not committed the acts charged.  His assailant had to have been the driver of his car at the time of the accident.  

The defendant also challenged the State's proof of recklessness and causation.  He tendered an accident reconstruction expert who disputed the State's evidence about how the accident occurred and who was at fault.  The defense expert opined that the operation of the deceased's vehicle, not the defendant's vehicle, was the sole cause of the accident.  Thus, identity was a legitimate issue, but not the only issue at the trial that led to the defendant's conviction. 

When presented with a similar hypothetical during oral argument, the State could not say whether our imaginary defendant could avail himself of the postconviction testing procedures provided by the legislature.  However, under the State's construction of section 116-3(b)(1), clearly he could not.  Since he made recklessness and causation additional issues and did not rely solely upon the question of who drove the vehicle, under the State's view he would not be an intended user of the statute.  Identity was not 
the
 issue, meaning the only issue, raised in the trial that led to his conviction.  Yet if the blood found on his steering wheel and dash and the hair follicles imbedded in that blood are still in existence and capable of being tested with integrity, they harbor a potential for exonerating.  Our imaginary defendant's circumstance is precisely the circumstance that section 116-3 was designed to address.  If the genetic makeup of the freshly spilled blood and hair follicles does not match the genetic makeup of the defendant's blood and hair follicles, in all likelihood he was not the driver of the vehicle.  In all likelihood, he was assaulted, and an assailant who stole his car was at the wheel when the accident occurred.  DNA testing would clearly possess the potential to produce new evidence materially relevant to his assertion of actual innocence.  Denying the defendant access to new forensic testing under such a circumstance, simply because other issues in addition to identity were litigated at the trial, would produce an absurd result not intended by those who drafted section 116-3. 

While the State misses the mark with its restrictive interpretation of the language contained in section 116-3(b)(1), it is precisely on target when it argues that identity was not the issue at Urioste's trial.  As previously noted, our legislature wanted postconviction forensic testing to occur only in those cases where such testing could discover new evidence at sharp odds with a previously rendered guilty verdict 
based upon criminal acts that the defendant denied having engaged in
.  Our legislature did not want convicted defendants who admitted at their trial to the commission of the acts charged, and did not contest the question of who committed those acts, to make a mockery of the criminal justice system and the statute's grace.  It did not want defendants who tendered unsuccessful affirmative defenses at their trial to later disavow the commission of the acts charged, just so they could obtain postconviction testing of evidence meaningless to how they contested their guilt. 

Where a defendant contests guilt based upon self-defense, compulsion, entrapment, necessity, or a plea of insanity, identity ceases to be the issue.  Insanity is like an affirmative defense in the sense that the defendant 
admits to the charged conduct
 but claims that he is not criminally responsible for that conduct because of a mental disease or defect.  See 
People v. Kashney
, 111 Ill. 2d 454, 464-65, 490 N.E.2d 688, 693 (1986).  When Urioste raised the question of insanity, he necessarily abandoned the question of who committed the acts charged for purposes of a section 116-3 motion.  When he chose to present psychiatric testimony that peered into the mental state with which he committed the stabbing, he asked the trier of fact to determine whether, 
at the time that he committed the acts charged
, he suffered from a mental malady the effect of which relieved him of criminal responsibility for
 his criminal conduct
.  He could not pursue an insanity plea and continue to maintain that he was not the person who committed the acts charged.

Notwithstanding, Urioste claims that his trial was unique.  He claims that he was permitted to challenge the State's identification evidence, persist in his plea of not guilty, and at the same time, maintain a plea of not guilty by reason of insanity.  We are told, in effect, that the insanity plea was fashioned like this–"I did not commit the acts that caused the death of Rebecca Rodgers and whoever did is still at liberty.  However, had I committed those acts instead of whoever did, I would not have been criminally responsible.  I was legally insane before, during, and after someone else stabbed Rebecca Rodgers." 

Thus, Urioste contends that identity was a contested issue at his trial and remained contested even as he pursued his plea of insanity.

Initially, we note that Urioste did not file a report of the trial proceedings with the record on this appeal.  We entered a rule to show cause why the appeal should not be disposed of by a summary order in light of the trial transcript's absence and the lack of any citation to a record in support of his claim of what happened at the trial.  The response was a motion to file an uncertified report of proceedings.  

We choose to address the claim despite the flawed record.  The position that Urioste takes is untenable.  When Urioste chose to put his mental condition at issue in order to free himself from criminal responsibility, he requested the trial judge to shift focus and decide the case on the defense of insanity as that term is defined under the criminal law.  Indeed, if the transcript that we now have in our possession is the transcript of the trial proceedings, that is precisely what Urioste's trial counsel asked the trial judge to do.  In that transcript, trial counsel, in closing, states: 

"I am asking you to find that he's not criminally responsible.  

The law is clear in this state.  It states that a person is not criminally responsible for conduct 
if at the time of such conduct
 as the result of mental disease or defect he lacks substantial capacity either to appreciate the criminality of 
his conduct
 or to conform 
his conduct
 to the requirement of the law."  (Emphasis added.)  

Under Illinois law, when Urioste tendered and pursued a plea of not guilty by reason of insanity, he called upon the trial judge to decide whether or not he was legally responsible 
for criminal conduct that he committed
.  By pursuing insanity as a defense, he removed identity as a legitimate issue the trial judge had to decide.  The question at the trial was no longer a question of who committed the acts charged.  Thus, identity was not the issue at his trial, and Urioste cannot meet a statutory prerequisite for new forensic testing.  

Finally, we agree with the State that the testing Urioste seeks is incapable of producing the kind of new evidence that postconviction forensic testing was designed to obtain.  We have already determined that since postconviction testing is predicated upon a claim of actual innocence, the legislature intended to limit the scope of section 116-3 to those rather unique cases where scientific testing could produce decisive evidence capable of exonerating.  See 
Savory
, 309 Ill. App. 3d at 414-15, 722 N.E.2d at 225.  
Contra People v. Rokita
, No. 5-99-0453 (September 8, 2000).  Our legislature did not intend to give convicted defendants free reign to claim innocence in order to test, or retest, evidence tangential to the core evidence of guilt.  It did not intend to provide a mechanism for convicted defendants to cast doubt upon extraneous evidence incapable of shaking our resolve in a guilty verdict's worth.  

Here, new forensic testing of blood samples is simply incapable of producing dramatic evidence of innocence.  It would not decisively refute other evidence of guilt.  Joyce Rodgers knew the defendant for his entire life.  Their relationship was of such a nature that Urioste referred to Joyce as "mom."  When Joyce saw Urioste on top of her daughter, she knew immediately who it was and reacted based upon that knowledge.  She was not identifying a stranger.  Her daughter's assailant was the boy next door who complied with her request to disengage, approached her face to face, and addressed her in a way unique to him.  We cannot imagine a sounder eyewitness identification. 

The identification did not stand alone.  It was corroborated by a wealth of other evidence that pointed out who committed the stabbing.  The report of the crime led to Urioste's immediate arrest.  Urioste was found in his bed, his body and underwear soiled with another person's fresh blood.  The blood fit the type possessed by the victim of a recent stabbing and attempted sexual assault.    

There was a second eyewitness who identified him, and his palm print was discovered inside the victim's home at a point of forced entry. 

There was evidence of prior conduct that mirrored the crime.  Urioste, in his defense, tendered evidence to establish that his mental condition prevented him from controlling sexual impulses and aggressive behavior.  He proved that his makeup made him capable of committing the crimes involved.

Finally, all of this evidence found confirmation in Urioste's gratuitous admissions to the police and to the judge who arraigned him.  

We know that Urioste was soiled with human blood that did not belong to him.  While we are uncertain of whose blood Urioste thinks he collected on his underwear the night of the attempted rape and murder, we are certain that no court in this land would feel compelled to release him based upon a belief in his innocence, even if DNA testing established that the blood on his underwear and on the knife was not Rebecca Rodgers' blood.  New forensic testing simply does not harbor the potential contemplated under the statute. 

 The legislature enacted section 116-3 as a safety net for use in special cases where postconviction tests could produce dramatic results that virtually confirm actual innocence.  It is a sound provision that was enacted for good reason.  One day it will no doubt provide a measure of genetic justice where human justice has failed.  It deserves better than to be trivialized by pointless efforts to invoke its favor. 

For all of the reasons stated, we affirm the trial court's dismissal of Urioste's motion for postconviction forensic testing of the blood evidence admitted at his 1987 trial.

Motion to strike granted; judgment affirmed.

GOLDENHERSH, P. J., and WELCH, J., concur.