STATE OF MAINE                                      SUPERIOR COURT
                                                    CRIMINAL ACTION
KENNEBEC, ss.                                       DOCKET NO. CR-94-393
                                                    JRA - KEN-11/20/2002

STATE OF MAINE          DONALD L. GARBRECHT
                               LAW LIBRARY

        v.                                          **DECISION AND ORDER**
                        JAN 9 2003
DANIEL DONOVAN,

            Defendant

        This matter is before the court on the petitioner's Post-Judgment Conviction Motion for DNA Testing and the State's Motion to Dismiss the petitioner's motion. As both motions address the same topic, namely whether the petitioner has the right to have certain exhibits submitted for DNA analysis, they will be considered together.

I.      **Facts and Procedural History.**

        The petitioner, Daniel Donovan (Donovan), was convicted on February 5, 1996, after a jury trial of the offenses of Gross Sexual Assault (GSA), Assault, Criminal Mischief and Violation of Bail Conditions. It is the conviction for GSA, for which the petitioner received a sentence of 20 years, all but 15 years suspended, and 6 years probation, that he seeks to affect by this motion. In this regard he alleges, and the record supports, that the evidence at trial included the following:

        On June 24, 1994, Robyn Reed (Reed), the petitioner's live-in companion, fled their home in Monmouth after she claimed to have been assaulted and her auto damaged by the petitioner. She returned to the house, however, at about 4:00 a.m. with a police escort. Upon arrival, the officer found the petitioner and Gary Marsella sleeping. After Donovan was awakened, Reed elected to remain at their house.

        At about 4:28 a.m., the police dispatch center received a 9-1-1 call from an "open line" which the Monmouth Police believed to have come from the petitioner's residence,

although they had no confirmation of its origin. From their vantage point nearby, the Monmouth police officers could hear an argument taking place inside the petitioner's home. Once it was confirmed that the call had come from that residence, one officer approached the house and asked to be let in. From the inside of the house he could hear Donovan say several times, "You came here for this." T.T., p. 109. The officer could also hear "what sounded like somebody being hilt (sic) against a wall or against the floor." *Id.* He also heard a female crying and asking that the police be let in.

The petitioner let the officer in whereupon the latter was advised that Reed had left by another door. The officer went to that door and found Reed outside on the porch crying, "shaking out of control," wearing ripped panties and holding her bra top up with one hand. T.T., pp. 111-112. She told the officer that, "he raped me" and that he would not let her leave. T.T., pp. 111, 135.

The officer, now joined by his chief, wrapped a blanket around Reed, and took her to their police cruiser. They then forcibly re-entered the house where they found the petitioner lying on his bed. They placed him under arrest and advised him that he was charged with rape to which the petitioner replied that he did not rape Ms. Reed. In the meantime, Gary Marsella, also a resident in the house, had come downstairs and joined the group. During this time, the defendant told the police they were stupid for having left Reed at his residence, and that "she was his problem." T.T., p. 119.

The petitioner was transported to the Kennebec County Jail where the sweatpants he had been wearing were taken from him.

In the meantime, Reed had been taken to the Kennebec Valley Medical Center where she was interviewed by the investigating officer who found her to be "visibly shaken" and unable to talk. T.T., p. 123. While there, however, at about 7:00 a.m.,

2

hospital staff took Reed's bra, panties and the blankets wrapped around her, but no examination via "the rape collection kit" was performed because Reed "refused the examination" although the attending nurse told her, "that the longer she waited to have an examination the harder it would be to collect evidence, to find evidence to collect." T.T., pp. 150, 152, 155. The nurse did observe that Reed had recent abrasions and scratches on her neck and chest. She also had blood stains on the inside of both her legs, although the source of the blood was not determined. Reed left the hospital at approximately 9:15 a.m.

At about 12:40 p.m., Reed returned to the emergency room where she was seen by the same nurse. She was still upset and complained of abdominal pain. T.T., p. 157. She was wearing a sweatsuit, apparently the same outfit the hospital had given her when she left earlier that day. T.T., pp. 156-157. These clothes were collected from her and turned over to a police officer. She was then given a "johnny" and participated in a rape examination for the purposes of collecting evidence.[1] During this examination, in addition to the bruises and scratches previously observed, a bruise was noted in the middle of Reed's back.

The physician who performed the examination on Reed used gauze pads or swabs from the rape kit to take samples from Reed's external genitalia. The doctor

---

[1] From the report of the forensic chemist, which was not admitted at trial, her testimony, and that of the nurse, it is apparent that no sanitary napkin was taken during Reed's first hospital visit but was taken, instead, during this second visit. Item L94-320-18 in the report, also marked as State's exhibit 28, is the black and white torn underpants taken from Reed on her first trip to the hospital. *See* Motion for DNA Testing, Attachment 4; T.T., pp. 111-112, 146-149, 170, 264, 268-269, 359, 372-373, 439. No sanitary napkin is described in the report or anywhere in the trial testimony as having been seized with these torn underpants, bra or blankets when Reed was taken to the hospital from the site of the alleged rape. Item L94-320-23D, however, describes a second pair of underpants containing a sanitary napkin which, from the context of the report, apparently were seized during the second hospital visit. Nothing in the testimony or the exhibits would contradict this conclusion.

observed blood during the pelvic examination which he believed to be menstrual blood, noting no traumatic injuries to that part of her body.

Reed advised the doctor during the examination that her assailant had used a condom and had ejaculated during the sexual assault. The doctor also took "collections" from inside Reed's vagina which he examined microscopically on a slide and found no sperm, opining that he would not have expected to find any if a condom was used. T.T., pp. 203-204. He also offered the opinion that it would be a little unusual, "but plausible as a possibility" for there to be spillage of semen on the external genitalia under some circumstances when a condom is used. T.T., p. 205.

After the police had delivered the petitioner to jail, and Reed to the hospital, they returned to their residence and found in the top of the kitchen trash can the shirt, now ripped, which they had seen Reed wear on their first encounter with her that morning. The Monmouth police chief returned another time to the same house later that morning with Reed after her second visit to the hospital. The purpose of this visit was to search for other physical evidence, including a condom. The chief reexamined the kitchen garbage bag where he had found Reed's ripped shirt. There he found an opened plastic condom package and a white plastic flip top cap, such as one might find on a catchup bottle, inside of which was a used condom. In this regard, Reed had told the chief that the condom used in the assault might be in one of the trash cans in the house.

Reed testified that the petitioner had used a condom during the sexual assault, that he always used a condom during intercourse and always threw them in the toilet after they had been used.

4

Thereafter the physical exhibits seized were shipped to the Maine State Police Crime Laboratory where they were examined by Allison Gingrass, a forensic chemist. She testified about these exhibits as follows:

- The petitioner's gray sweatpants had "thin red brown stains on the inside of the waistband," but they could not be confirmed as human blood. T.T., p. 437. No semen was found on this item.

- The torn underpants, State's exhibit 28, "had a very thin red brown stain, which would indicate there was blood in the crotch." T.T., p. 439. No semen was detected in the crotch of this garment.

- The swab of Reed's external genitalia also had thin red brown stains. Semen was detected on this item. However, the swabbing contained a mixture of fluids from Reed and whoever deposited the semen. As a result, there was a dilution factor so that it could not be determined what part of the mixture belonged to Reed and what part belonged to the other person.

- This mixed fluid stain contained the H antigen which meant that substance in the stain came from a group O person, the group Reed belongs to.

- It could not be said that some of the H antigen in the substance did not come from someone else because the stain tested was a mixture of bodily fluids. However, if the semen did come from a person with a different blood grouping, one would not necessarily find that evidence because the fluids were mixed and diluted, thereby masking any results.

- Donovan's blood grouping is a B secretor, a B and H blood group.

5

-    The condom contained semen with both the B and H blood group, indicating that the semen came from a group B person who was a secretor.

-    It is impossible to determine when the examined stains were deposited.

Although she did not testify as to these conclusions, the chemist's report shows that she found no semen on the vaginal swabs taken from Reed during her second hospital visit, found blood, but no semen, in the crotch area of the blue sweatpants she wore on this visit, and no semen on a heavily blood-stained sanitary napkin also taken on this occasion. Motion for DNA Testing, Attachment 4, p. 6.

## II.    Discussion.

The petitioner's argument is founded on the contention that Reed had no sexual intercourse before her first hospital visit on June 24, 1994, as evidenced by the absence of semen on the sanitary napkin she was wearing at that time. According to his argument, "The sanitary napkin goes to the heart of the Petitioner's claim that Robyn was not raped." Motion for DNA Testing, p. 4. As noted at footnote 1, *infra*, however, it is apparent that the sanitary napkin was not taken during this hospital visit, but was seized on Reed's second trip to the emergency room. Nevertheless, while not mentioned by the petitioner, it is true that the torn underwear Reed had when she first visited the hospital after the alleged rape contained blood, but no semen.

The petitioner further argues that Reed, on leaving the hospital, knew that the medical staff there was looking for semen. With that knowledge, the petitioner claims, she went home and had sexual intercourse with Gary Marsella, or another person, so that "the nurse in the exam room could discover semen on her vagina." Memorandum in Opposition to State's Motion to Dismiss, p. 4. Marsella then drove her back to the

6

hospital so that she could then submit to the sexual assault examination. As noted, it was during that examination that a swab was taken of Reed's external genitalia which ultimately showed blood consistent with her type mixed with semen, and the presence of the H antigen.

The petitioner argues that this test of the mixed fluids taken from this swab shows that no B blood group substances were present on this swab.[2] Accordingly, he contends that someone else is responsible for the semen found on Reed's genitalia and that DNA testing of this specimen would establish that the semen was not his, thereby establishing his innocence.

With respect to the condom, although the chemist testified that it contained semen with the B and H blood group which would permit the conclusion that it came from a type B secretor such as Donovan, the petitioner argues that this semen, too, came from another man. As such, he asks that this exhibit be submitted for DNA testing, contending that it will show the semen originated from someone else.

Pursuant to the statute relied on by the petitioner, the court is to order DNA analysis if the movant "presents prima facie evidence that . . . [t]he identity of the person as the perpetrator of the crime that resulted in the conviction was at issue during the person's trial." 15 M.R.S.A. § 2138(4)(E).[3]

---

[2] Actually, the chemist never testified that no B blood group substances were present in the fluid on the swab.

[3] It appears that the petitioner meets all the statutory prerequisites to file this motion and that he has presented prima facie evidence as to the other elements necessary to obtain the order sought via this section. In this regard, the court concludes that the State's argument that the petitioner has failed to establish that the "evidence sought to be analyzed is material to the issue of the person's identity as the perpetrator of . . . the crime . . .", 15 M.R.S.A. § 2138(4)(A) is without merit, so that this contention will not be addressed here. This is because the evidentiary exhibits at issue here plainly bear on the issue of the perpetrator's identity; were it otherwise the State would never have offered them, and the court would not have admitted them, as exhibits at trial.

Relying on the case law submitted by the parties which comes from other jurisdictions, but interprets statutes similar to ours, it appears that the petitioner cannot meet his burden of persuasion.

From these precedents, it appears that the statutory remedy which allows DNA testing is confined to trials where identity was a legitimately contested issue, although not necessarily the only issue tried. *People v. Urioste*, 316 Ill. App.3d, 307, 736 N.E.2d 706, 713, 249 Ill. Dec. 512, 519 (Ill. App. 2000). In the case at bar, identity of Reed's alleged assailant was never at issue; instead, the attack on the State's case was that Reed was untruthful and that there was no sexual intercourse, forced or otherwise.[4] T.T., pp. 584-586, 589-590, 592, 596-599, 602. Indeed, the petitioner's arguments in support of this motion are consistent with that approach -- Reed was never sexually assaulted; Reed engaged in consensual intercourse with a man, not petitioner, to create evidence of intercourse; and Reed's intention was to use that evidence to bolster her accusations against the petitioner.

In this regard, if the petitioner's theory is correct that Reed had sexual intercourse with another man between hospital visits in order to produce evidence of semen, DNA testing of exhibits taken during the second hospital visit would only demonstrate whether some other man had had consensual intercourse with Reed sometime between 9:15 a.m. and 12:40 p.m. on June 24. While such evidence, if produced, would impeach Reed's credibility, it does not address the identity of the person who she says raped her at approximately 4:30 a.m. that morning.

---

[4] At petitioner's post-conviction review proceeding, he made the same point -- no sexual intercourse with Reed, forced or otherwise, occurred between the two police visits to his home early in the morning of June 24, 1994. PCRT, pp. 170-171.

The same observations can be made about the semen in the condom found in the trash. If this was used by Marsella or another man to have intercourse with Reed between her hospital visits and "planted" for the police to find, DNA analysis of that semen would only show that Reed appears to be manipulative -- a point already promoted thoroughly at trial by the petitioner.[5] It would also show that some male other than the petitioner had intercourse with Reed mid-morning on June 24 -- well after she had reported being raped. Moreover, at the hearing on the petitioner's post-conviction petition, he testified that he normally wore a condom when having sexual intercourse with Reed after which it would be thrown into the toilet or the trash. PCRT, p. 166. He also testified that he had had sexual intercourse with Reed the day before this event, and the night before that. PCRT, p. 171.[6] If this account is accurate, then the condom in the trash seized by the police on June 24th was as likely one used several days earlier as it was by another man earlier on June 24, or by the petitioner himself when it is alleged he raped Reed at about 4:00 a.m. on that day. This is so, because, in part, there is no way of knowing how long a fluid sample existed before it was tested, according to the testimony of the forensic chemist. T.T., p. 456. In other words, DNA analysis of the condom would simply yield no persuasive evidence as to the identity of Reed's assailant. Thus, from the evidence described, it appears that the DNA in this semen was either Donovan's or the man with whom Reed allegedly had

---

[5] It appears to be inconsistent with the petitioner's theory of this case that Reed would have intercourse between hospital visits with a willing co-conspirator in order to have semen later found in her vagina by hospital staff and then have that intercourse conducted with a condom which is designed to prevent semen from entering the vagina.

[6] Contrary to this testimony, the petitioner has filed an affidavit with this court in which he denies having sexual intercourse with Robyn Reed in June of 1994. Affidavit of Daniel J. Donovan in Support of Post-Judgment of Conviction Motion for DNA Testing, June 25, 2002.

9

intercourse mid-morning on June 24. Either way, such DNA analysis does not establish that some other man raped Reed earlier that day under any factual theory advanced in this case.

With respect to the torn underwear, the absence of semen on this garment supports the petitioner's strained contention that Reed had had no intercourse before her first hospital visit, but did before her second. It does not, however, assist in identifying a perpetrator of a rape earlier that morning, because no semen at all was found on this item. Thus, it simply supports the petitioner's contentions that there was no intercourse and that Reed is untruthful. Also, because there was no semen on this underwear, it is pointless to submit the exhibit for DNA testing when no semen exists there to be tested.

The petitioner's legal argument to counter the State's objection to his motion rests on two legal propositions, both of which are inapplicable here. The first is that an inmate in a federal section 1983 action has a right to DNA testing of exhibits offered against him at his trial for two rapes, even though evidence of his guilt was quite strong. *Godschalk v. Montgomery County Dist. Attorney's Office*, 177 F.Supp.2d 366, (E.D.Pa. 2001) (Relying on principles of due process and the obligation to provide the accused with exculpatory evidence as articulated in *Brady v. Maryland*, 373 U.S. 83 (1963)). This federal trial court, then, was not attempting to interpret a statute that permits post-trial DNA testing of exhibits when identity was an issue at trial. Rather, that court determined there is a right of constitutional proportions to such testing, whether or not identity was contested at trial, in the context of a federal civil rights claim.

In the other precedents cited by the petitioner, it was decided that the failure of trial counsel to pursue DNA testing of exhibits may amount to ineffective assistance of counsel. *Dorsey v. Kelly*, 117 F.3d 50 (2d. Cir. 1997); *Baylor v. Estelle*, 94 F.2d 1321 (9th Cir. 1996).

While this court appreciates the reference to such cases where, as here, there is a dearth of case law nationally on the right to post-conviction DNA analysis, the narrow question presented in the case at bar is whether or not the petitioner is entitled, on these facts and under Maine's statute, to DNA analysis of the exhibits he has listed. This is not a federal civil rights case nor a second visit to the issue of whether or not Donovan had effective assistance of counsel at trial.

In this court's view, the petitioner has not presented a prima facie case, that is, "evidence which if unrebutted or unexplained is sufficient to maintain the proposition, and warrant the conclusion to support which it [has been] introduced . . ." *Hann v. Merrill*, 350 A.2d 545, 550 (Me. 1973) (citation omitted), that the identity of the person who perpetrated a sexual assault was at issue during his trial. 15 M.R.S.A. § 2138(4)(E). As the State has argued, identity is always an issue at trial. However, that does not mean that an unsuccessful defendant is entitled to DNA analysis in every case. Instead, in this court's view, identity must be an issue that was actually contested, litigated or placed in question at trial. That is simply not the case here. Reed specifically accused the petitioner, and no one else, of rape. His response then, and now, is that no intercourse occurred between them during the specific time she says she was assaulted, and that she is not worthy of belief. DNA evidence would not establish that someone else raped Ms. Reed and it would not disprove that sexual intercourse occurred at some time. Rather, DNA testing may, if successfully undertaken, add only to the

11

considerable array of evidence already used by the petitioner to discredit his accuser. That is not the purpose of the statute, and the court cannot, therefore, extend its benefits to the petitioner.

Accordingly, the entries will be:

Petitioner's Post-Judgment of Conviction Motion for DNA Testing is DENIED; State's Motion to Dismiss Defendant's Motion for Post-Judgment DNA Testing is GRANTED.

So ordered.

Dated: November 20 , 2002

John R. Atwood
Justice, Superior Court

12

STATE OF MAINE
  vs
DANIEL  DONOVAN
BOLDUC CORRECTIONAL FACILITY 516 CUSHING RD UNIT 200
WARREN ME 04864

SUPERIOR COURT
KENNEBEC, ss.
Docket No  AUGSC-CR-1994-00393

**DOCKET RECORD**

DOB: 08/29/1963
Attorney: ANDREWS CAMPBELL
          CAMPBELL LAW OFFICE
          45 KALERS CORNER ROAD
          WALDOBORO ME 04572
          APPOINTED 03/20/2002

State's Attorney: DAVID CROOK

Filing Document: INDICTMENT
Filing Date: 08/11/1994

Major Case Type: FELONY (CLASS A,B,C)

## Charge(s)

1   GROSS SEXUAL ASSAULT                          06/22/1994 MONMOUTH
    17-A   253(1)(A)          Class A


2   ASSAULT                                       06/22/1994 MONMOUTH
    17-A   207(1)             Class D


3   CRIMINAL MISCHIEF                             06/22/1994 MONMOUTH
    17-A   806(1)(A)          Class D


4   VIOLATING CONDITION OF RELEASE               06/22/1994 MONMOUTH
    15     1092                    Class E


## Docket Events:

03/05/2002 FILING DOCUMENT -  INDICTMENT FILED ON 08/11/1994

        NOTE -  PRIOR ENTRIES IN MANUAL DOCKET ENTERED ON 08/11/1994

        TRANSFER -  BAIL AND PLEADING GRANTED ON 08/11/1994

        TRANSFER -  BAIL AND PLEADING REQUESTED ON 08/11/1994

03/05/2002 MOTION -  OTHER MOTION FILED BY DEFENDANT ON 02/27/2002

        MOTION FOR DNA TESTING.
03/05/2002 MOTION -  MOTION FOR APPOINTMENT OF CNSL FILED BY DEFENDANT ON 02/27/2002

        ALONG WITH CERTIFICATE OF PRISONER'S ACCOUNT.
03/20/2002 MOTION -  MOTION TO DISMISS FILED BY STATE ON 03/19/2002

        DA:  ALAN KELLEY
04/01/2002 HEARING -  OTHER MOTION SCHEDULED FOR 04/18/2002 @ 8:15

NOTICE TO PARTIES/COUNSEL
TESTING AND STATE'S MOTION TO DISMISS
04/01/2002 HEARING - OTHER MOTION NOTICE SENT ON 04/01/2002

04/01/2002 WRIT - HABEAS CORPUS TO TESTIFY ISSUED ON 04/01/2002

CERTIFIED COPY TO SHERIFF DEPT.
04/01/2002 HEARING - MOTION TO DISMISS SCHEDULED FOR 04/08/2002 @ 8:15

NOTICE TO PARTIES/COUNSEL
04/01/2002 MOTION - MOTION FOR APPOINTMENT OF CNSL GRANTED ON 03/20/2002
DONALD H MARDEN , JUSTICE
COPIES TO PARTIES/COUNSEL                                          ANDREWS
CAMPBELL COURT APPOINTED.
04/01/2002 ATTORNEY - APPOINTED ORDERED ON 03/20/2002

Attorney: ANDREWS CAMPBELL
04/01/2002 HEARING - MOTION TO DISMISS NOTICE SENT ON 04/01/2002

04/05/2002 OTHER FILING - OTHER DOCUMENT FILED ON 04/03/2002

REQUEST FOR SCHEDULING ORDER FILED.
04/17/2002 OTHER FILING - OTHER DOCUMENT FILED ON 04/17/2002

OPPOSITION TO STATE'S MOTION TO DISMISS.
05/09/2002 OTHER FILING - TRANSCRIPT ORDER FILED ON 05/07/2002

Attorney: ANDREWS CAMPBELL
COPY OF ORDER SENT TO PHIL GALUCKI ON 5/9/02.
06/07/2002 MOTION - MOTION FOR ENLARGEMENT OF TIME FILED BY DEFENDANT ON 06/07/2002

Attorney: ANDREWS CAMPBELL
REQUEST FOR ENLARGEMENT OF TIME TO FILE MEMO. MAILED TO JUSTICE ATWOOD IN SAGADAHOC
COUNTY.
06/11/2002 MOTION - MOTION FOR ENLARGEMENT OF TIME WITHDRAWN ON 06/10/2002

Attorney: ANDREWS CAMPBELL
06/18/2002 OTHER FILING - MEMORANDUM OF LAW FILED ON 06/17/2002

MEMORANDUM IN SUPPORT OF STATE'S MOTION TO DISMISS. MAILED TO JUSTICE      ATWOOD
06/19/2002 MOTION - MOTION TO DISMISS UNDER ADVISEMENT ON 04/18/2002
JOHN R ATWOOD , JUSTICE
06/19/2002 MOTION - OTHER MOTION UNDER ADVISEMENT ON 04/18/2002
JOHN R ATWOOD , JUSTICE
MOTION FOR DNA TESTING.
06/20/2002 OTHER FILING - MEMORANDUM OF LAW FILED ON 06/20/2002

Attorney: ANDREWS CAMPBELL
PETITIONER'S MEMORANDUM ON IDENTITY
08/02/2002 HEARING - OTHER MOTION HELD ON 04/18/2002

NOTICE TO PARTIES/COUNSEL                                          MOTION FOR DNA
TESTING AND STATE'S MOTION TO DISMISS

08/02/2002 MOTION -  MOTION TO IMPOUND FILED BY DEFENDANT ON 06/28/2002

       FILED BY ANDREW CAMPBELL, IT DOES NOT REQUIRE A HEARING.
08/02/2002 OTHER FILING -  OTHER DOCUMENT FILED ON 06/28/2002

       DEFENDANT'S PRO SE SUPPLEMENTAL MEMORANDUM FILED BY DANIEL DONOVAN. DEFENDANT'S RESPONSE
       TO STATE'S MEMORANDUM.
11/21/2002 MOTION -  MOTION TO DISMISS GRANTED ON 11/20/2002
       JOHN R ATWOOD , JUSTICE
       COPIES TO PARTIES/COUNSEL
11/21/2002 MOTION -  OTHER MOTION DENIED ON 11/20/2002
       JOHN R ATWOOD , JUSTICE
       MOTION FOR DNA TESTING.
11/21/2002 ORDER -  COURT ORDER ENTERED ON 11/20/2002
       JOHN R ATWOOD , JUSTICE
       PETITIONER'S POST-JUDGMENT OF CONVICTION MOTION FOR DNA TESTING IS DENIED; STATE'S MOTION
       TO DISMISS DEFENDANT'S MOTION FOR POST JUDGMENT DNA TESTING IS GRANTED.

A TRUE COPY
ATTEST: _____
               Clerk