family law, and civil procedure. O'Siochain was deemed qualified to sit for the New York bar examination, having shown, inter alia, that the course of study he successfully completed was the substantial equivalent of the legal education provided by an ABA-approved law school. He was tested by the New York bar examination in all fundamental areas of U.S. law, including trusts and estates, family law, and civil procedure. He passed the New York bar examination and is a licensed attorney in good standing with the New York bar.

When O'Siochain's education is combined with his work experience as an attorney, efforts to become acquainted with U.S. law, passing of the New York bar examination, and admission to the New York bar, a waiver is appropriate. Upon a de novo review of the facts of this case, we conclude that O'Siochain is a qualified applicant for waiver.

## CONCLUSION

Based on a de novo review, we conclude that O'Siochain has met his burden of proving his law school education and experience were functionally equivalent to the education received at an ABA-approved law school and that as a result, a waiver of the educational qualifications requirement of § 3-105(A)(1)(b) is appropriate. We waive this requirement as it applies to O'Siochain and will allow him to be admitted to the Nebraska bar.

APPLICATION GRANTED.

---

STATE OF NEBRASKA, APPELLEE, V.
JUNEAL DALE PRATT, APPELLANT.
___ N.W.2d ___

Filed February 21, 2014.    No. S-11-760.

1. **DNA Testing: Appeal and Error.** A motion for DNA testing is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed.

2. ____: ____. In an appeal from a proceeding under the DNA Testing Act, the trial court's finding of fact will be upheld unless such findings are clearly erroneous.

3. **Judgments: Appeal and Error.** When dispositive issues on appeal present questions of law, an appellate court has an obligation to reach an independent conclusion irrespective of the decision of the court below.

4. **DNA Testing: Evidence.** After a proper motion seeking forensic DNA testing has been filed, the State is required by Neb. Rev. Stat. § 29-4120(4) (Reissue 2008) to file an inventory of all evidence that was secured by the State or a political subdivision in connection with the case.

5. **Evidence: Proof.** The burden to produce evidence will rest upon the party who does not have the general burden of proof if that party possesses positive and complete knowledge concerning the existence of facts which the party having that burden is called upon to negative, or if the evidence to prove a fact is chiefly within the party's control.

Petition for further review from the Court of Appeals, INBODY, Chief Judge, and MOORE and RIEDMANN, Judges, on appeal thereto from the District Court for Douglas County, W. RUSSELL BOWIE III, Judge. Judgment of Court of Appeals affirmed.

Tracy L. Hightower-Henne, of Hightower Reff Law, L.L.C., for appellant.

Jon Bruning, Attorney General, and James D. Smith for appellee.

Amy A. Miller for amicus curiae American Civil Liberties Union Foundation of Nebraska.

HEAVICAN, C.J., WRIGHT, CONNOLLY, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

McCORMACK, J.

### NATURE OF CASE

Under the DNA Testing Act, an inmate seeks retesting of DNA evidence relating to his 1975 convictions of robbery, rape, and sodomy. Previous DNA testing in 2005 revealed that at least one stain of biological material was from a male who was not the defendant. However, the testing conducted in 2005 could not distinguish between semen and epithelial cells in older materials. Furthermore, there was evidence that the materials had been handled by numerous parties and that the amount of DNA found on the materials could have come from such handling. Therefore, the DNA test results were neither

exonerating nor exculpatory and the district court denied the inmate's motion to vacate his convictions or grant a new trial, based on the 2005 test results. The inmate's current motion for DNA testing alleges that new, more accurate testing techniques may lead to exonerating or exculpatory evidence. In particular, an expert affidavit establishes that current testing technology can distinguish between semen and epithelial cells on the materials in question. The district court denied the motion for retesting. The Nebraska Court of Appeals reversed. For reasons different from those stated by the Court of Appeals, we affirm its determination that the district court erred in denying Pratt's motion for retesting under the Act.

## BACKGROUND

### Trial and Convictions

In 1975, Juneal Dale Pratt was convicted of sodomy, forcible rape, and two counts of robbery. The evidence at trial showed that two sisters had been forced into their hotel room, where they were robbed and sexually assaulted by a single male perpetrator. The perpetrator ripped the sisters' shirts down the front, apparently in an attempt to find hidden money. He forced them to remove the rest of their clothes. The perpetrator proceeded to make one sister perform oral sex on him, while the other sister's face was covered with an article of clothing. The perpetrator did not ejaculate during oral sex. The perpetrator then raped the other sister, while the first sister's face was covered with an article of clothing. Sperm cells were found on that sister's vaginal walls. She testified at trial that she was wearing her torn shirt at the time of the rape. Both sisters testified that the perpetrator repeatedly rummaged through their belongings looking for more money and other items of value. He then left them tied up and alone in the hotel room.

The State presented evidence that Pratt had robbed another victim at the same hotel approximately a week after the robberies and assaults of the sisters. Pratt was apprehended after a chase that followed this second robbery. The sisters had independently identified Pratt as the perpetrator in both a three-man lineup and a voice lineup. In addition, the sisters recognized

the shoes worn by Pratt as the shoes worn by the perpetrator and they identified a ring worn by Pratt as a ring stolen during the robberies and assaults.

Pratt testified in his own defense at trial. He presented an alibi, which was confirmed by his live-in girlfriend. Pratt's sister testified that the ring in question belonged to her. A shoe-store owner testified that the type of shoes Pratt was wearing was not uncommon.

The jury found Pratt guilty of all crimes charged. He was sentenced to consecutive prison terms of 5 to 10 years on the sodomy count, 7 to 20 years on the rape count, and 10 to 30 years on each robbery count. His convictions and sentences were affirmed on direct appeal.[1]

### 2004 MOTION FOR DNA TESTING

In 2004, Pratt moved for testing under the DNA Testing Act (hereinafter the Act).[2] Pursuant to the requirements of the Act, the State filed an inventory of all evidence that was secured in connection with Pratt's case.[3] The inventory revealed that the State had retained the two ripped shirts, a bra, and the clothing worn by Pratt the day he was apprehended. The State had not retained the semen samples obtained from the rape victim. The sisters' underwear had likewise been either lost or destroyed.

All the retained clothing was stored together in a small cardboard box. Each item had an exhibit sticker on it.

The district court granted Pratt's 2004 request to conduct DNA testing. The State did not appeal from the 2004 order granting testing under the Act.

No apparent stains were found on the bra. Several stained areas containing potential biological materials were identified on the torn shirts, however, and were tested in 2005 at the University of Nebraska Medical Center (UNMC). Pratt provided a buccal swab for comparison to any DNA found. Pratt's clothes were not tested.

---

[1]  *State v. Pratt*, 197 Neb. 382, 249 N.W.2d 495 (1977).

[2]  See Neb. Rev. Stat. §§ 29-4116 to 29-4125 (Reissue 2008).

[3]  § 29-4120(4).

The presumptive testing conducted in 2005 to identify whether any DNA found was from semen cells or epithelial cells targeted an enzyme that was not stable. Thus, given the age of the biological material on the shirts, the DNA testing conducted could not distinguish whether any DNA identified on the shirts came from semen cells or epithelial cells.

Most of the 2005 DNA test results were inconclusive as to Pratt. But one stain on the rape victim's shirt showed that while it may or may not have been a mixture of one or more individuals, if it was not a mixture, then Pratt would be excluded. Another area of that same shirt showed a mixture of more than one individual's DNA. At least one of the contributors to that mixture was male. The DNA testing excluded Pratt as that male.

Given the amplification methods available in 2005, and without the DNA profiles of the victims to help sort out mixtures, UNMC was unable to isolate and identify any full DNA profile.

### 2007 Motion to Vacate/New Trial
### After 2005 Test Results

Based on the presence of an unidentified male's DNA on the rape victim's shirt, in 2007, Pratt filed a motion under § 29-4123 to vacate and set aside his conviction or, in the alternative, for new trial.

The technologist who conducted the DNA testing testified at the hearing on Pratt's 2007 motion. The technologist testified that it was her practice to try to cut out as small a sample as possible in order to leave some of the biological stain for subsequent testing that she or anyone else would need to do. She testified that the remaining stained pieces of fabric from the victims' shirts should have been returned to the State's custody with the rest of the evidence.

The technologist testified that storing several items together in a cardboard box was not an appropriate way to store items to avoid cross-contamination. She did not, however, connect this possibility of cross-contamination to her interpretation of the results of the DNA testing.

The technologist testified that by merely touching clothing, a person could deposit sufficient DNA in epithelial cells to result in a partial profile, given the amplification techniques available in 2005. The technologist conceded that if the shirts were handled by male police officers, clerks, and jurors, then any of those persons could have deposited the male DNA she detected. She testified that it was impossible to know how or when the DNA she detected was deposited on the victims' shirts.

On February 28, 2008, the district court denied Pratt's motion to vacate or for new trial. Apparently based on the technologist's testimony, the court concluded that "[n]either of the shirts [was] handled or stored in a way likely to safeguard the integrity of any biological matter which may have been deposited on them at the time of the attacks . . . ." The court explained that the shirts must have been touched when the exhibit stickers were placed on them and that the shirts, because they bore exhibit stickers, must have been available for the jurors to inspect. The court noted that several jurors, the prosecutor, the defense lawyers, and the court reporters were male. The district court noted that at the time of the trial, there was no awareness that simply handling the shirts could "contaminate" them for future scientific testing. The court concluded that since there was no evidence of semen on the shirts and simply handling the shirts could have deposited DNA material sufficient for a partial profile, the results neither exonerated nor exculpated Pratt.

On appeal from that 2008 order, we affirmed the denial of the motion to vacate or for new trial.[4] We reiterated the reasoning of the district court, including that "the evidence was not stored in such a way as to preserve the integrity of any DNA evidence."[5] We explained, as the district court did, that the DNA cells of another male found on the clothing could have come from extraneous epithelial cells deposited from simply handling the clothing.

---

[4] *State v. Pratt*, 277 Neb. 887, 766 N.W.2d 111 (2009).

[5] *Id.* at 895, 766 N.W.2d at 117.

### 2011 Motion for
### DNA Retesting

In 2011, Pratt filed a second motion for DNA testing of the biological evidence pertinent to his conviction. Pratt alleged that testing techniques now available at certain accredited laboratories can distinguish semen cells from epithelial cells—even when those cells are approximately 30 years old. Furthermore, new testing procedures could potentially extract the victims' DNA from the armpit or collar of the victims' shirts and remove those profiles from the mixed samples, leading to the identification of full profiles from the DNA present. Finally, Pratt alleged generally that more powerful amplification techniques could render a complete profile of the male DNA on the shirts. Pratt expected to be excluded as a contributor of the DNA on the shirts, and he expected to be able to search DNA databases to find the true perpetrator of the crimes. He alleged that none of the requested testing was available in 2005.

Pratt attached to his motion the affidavit of Brian Wraxall, chief forensic serologist of the Serological Research Institute in California. That affidavit was entered into evidence at the hearing on the motion for testing.

Wraxall stated that he had reviewed the 2005 DNA analysis of the biological materials found on the shirts. Wraxall opined that "the analysis of the items of evidence submitted to UNMC is by far incomplete due to the limitations of the testing done at UNMC and to the improvements in technology that have occurred since 2005." Wraxall explained that the testing used in 2005 targeted a semen-specific enzyme that was not stable and tended to degrade over time. Wraxall instead proposed that a "P30" test be utilized, which targets a semen protein that "is very stable." Wraxall explained that finding spermatozoa in 30-year-old cases was "very possible."

Wraxall further averred that "[w]e now have techniques that were not available in 2005 but can be used to increase our ability to obtain full profiles in small, old and degraded samples." Wraxall stated that although it would be ideal to obtain DNA samples from the victims, it "was and is possible" to attempt to extract the victims' DNA from certain areas of

the shirts, and thereby isolate the male DNA profile from the mixed stains. Wraxall explained that "[i]f the clothing is not washed (e.g. hats) DNA from perspiration and abrasions can build up on the item where it is in contact with the body." He would attempt to extract the victims' DNA from those areas. Wraxall opined that any risk due to commingling of the clothing was "minimal."

The district court denied the motion for retesting of the shirts. The court found that the first prong of § 29-4120(5) was met—that the DNA testing requested was not available at the time of his trial.

But the court found that the second prong of § 29-4120(5) was not met. The court reasoned that it had "already determined that the materials to be tested were not maintained under circumstances likely to safeguard the integrity of their original composition, and the Supreme Court affirmed that finding." In addition, the court explained, "[i]t is quite possible that the clothing has further deteriorated or been further handled in a manner to deposit still more unidentified DNA."

The court alternatively found that the third prong of § 29-4120(5) was not met—that the requested testing would not provide noncumulative exculpatory evidence. In support of that finding, the court outlined the evidence against Pratt at his original trial. The court said that any test results would create "only another circumstance on which Pratt cou[ld] argue reasonable doubt."

Pratt appealed the denial of his motion for DNA testing to the Court of Appeals. The State did not cross-appeal.

### Appeal

Pratt argued on appeal that the lower court was bound by law of the case, res judicata, or collateral estoppel and could not redetermine its finding in 2004 that the biological material was retained under circumstances likely to safeguard the integrity of its original physical composition. He apparently did not make those issue-preclusion arguments to the district court. Pratt also asserted that the shirts have been retained in the custody of either the State or UNMC since the first tests were conducted and that the court erred in finding prong two

was not met. Finally, Pratt argued that the district court erred in finding that new DNA tests could not lead to exculpatory evidence.

In its reply brief, the State argued that the district court's decision was correct because none of the three prongs of § 29-4120(5) had been satisfied.

The State argued that the first prong was not met, because Wraxall's affidavit did not *explicitly* state that the testing now requested was not available at the time the first request was granted.

The State argued that the second prong of § 29-4120(5) was not met, because Pratt presented no evidence on the issue of whether the evidence had been retained under circumstances likely to safeguard the integrity of their original composition. In particular, the State refused to concede that, since 2005, it had retained the evidence in its custody and in a manner mandated by the Act.[6]

The State argued that the third prong of § 29-4120(5) was not met, because DNA testing would not necessarily provide any conclusive result as to the source of the male DNA, as alleged in Pratt's motion. Like the district court, the State cited to the strength of the State's original case against Pratt.

The Court of Appeals reversed the decision of the district court. The Court of Appeals rejected Pratt's various arguments for issue preclusion. But it held that the lower court abused its discretion when it denied Pratt's second motion for DNA testing, concluding that the three prongs of § 29-4120(5) had been met.[7] We granted the State's petition for further review.

## ASSIGNMENTS OF ERROR

The State assigns that the Court of Appeals erred by (1) finding that biological material had been retained under circumstances likely to safeguard the integrity of its original physical composition based upon a review of the evidence since the previous motion for DNA testing; (2) concluding that

---

[6] See § 29-4125.

[7] *State v. Pratt*, 20 Neb. App. 434, 824 N.W.2d 393 (2013).

DNA testing may produce noncumulative, exculpatory evidence; and (3) ordering successive DNA testing.

## STANDARD OF REVIEW

[1] A motion for DNA testing is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed.[8]

[2] In an appeal from a proceeding under the Act, the trial court's finding of fact will be upheld unless such findings are clearly erroneous.[9]

[3] When dispositive issues on appeal present questions of law, an appellate court has an obligation to reach an independent conclusion irrespective of the decision of the court below.[10]

## ANALYSIS

### The Act

The Act, passed in 2001, was intended to allow wrongfully convicted persons the opportunity to establish their innocence through DNA, or deoxyribonucleic acid, testing, which was not widely available before 1994.[11] In addition, the Legislature declared that

> new forensic DNA testing procedures . . . make it possible to obtain results from minute samples that previously could not be tested and to obtain more informative and accurate results than earlier forms of forensic DNA testing could produce. As a result, in some cases, convicted inmates have been exonerated by new DNA tests after earlier tests had failed to produce definitive results.[12]

The Legislature declared in § 29-4118(4) that "DNA testing is often feasible on relevant biological material that is decades old." "DNA evidence produced even decades after a

---

[8] *State v. Leon*, 279 Neb. 734, 781 N.W.2d 608 (2010).

[9] See *State v. Haas*, 279 Neb. 812, 782 N.W.2d 584 (2010).

[10] See *State v. Morgan*, 286 Neb. 556, 837 N.W.2d 543 (2013).

[11] §§ 29-4117 and 29-4118.

[12] § 29-4118(3).

conviction can provide a more reliable basis for establishing a correct verdict than any evidence proffered at the original trial."[13] "DNA testing," the Legislature explained, "responds to serious concerns regarding wrongful convictions, especially those arising out of mistaken eyewitness identification testimony."[14]

A person in custody takes the first step toward obtaining possible relief under the Act by filing a motion requesting forensic DNA testing of biological material. We have described DNA testing as being "available"[15] under § 29-4120(1) for any biological material that (1) is related to the investigation or prosecution that resulted in the judgment, (2) is in the actual or constructive possession of the State or others likely to safeguard the integrity of the biological material, and (3) either was not previously subjected to DNA testing or can be retested with more accurate current techniques.

[4] After a proper motion seeking forensic DNA testing has been filed, the State is required by § 29-4120(4) to file an inventory of all evidence that was secured by the State or a political subdivision in connection with the case. Then, upon consideration of affidavits or after a hearing, pursuant to § 29-4120(5), the court "shall" order testing upon a determination (1) that such testing was effectively not available at the time of trial, (2) that the biological material has been retained under circumstances likely to safeguard the integrity of its original physical composition, and (3) that such testing may produce noncumulative, exculpatory evidence relevant to the claim that the person was wrongfully convicted or sentenced.

Once the court orders testing, if the test results "exonerate or exculpate"[16] the person, then either party may request a hearing before the district court. Following such hearing, the district court may, on its own motion or upon the motion of

---

[13]  § 29-4118(4).

[14]  § 29-4118(6).

[15]  See, e.g., *State v. Phelps*, 273 Neb. 36, 40, 727 N.W.2d 224, 227 (2007).

[16]  § 29-4123(2).

any party, vacate and set aside the judgment.[17] Alternatively, any party may file a motion for new trial under Neb. Rev. Stat. §§ 29-2101 to 29-2103 (Reissue 2008).[18] The extraordinary remedy of vacating the judgment is available for the compelling circumstance in which actual innocence is conclusively established by DNA testing.[19] In contrast, an ordinary remedy of a new trial is provided for circumstances in which newly discovered DNA evidence would have, if available at the former trial, probably produced a substantially different result.[20]

The order before us is the district court's denial of Pratt's motion for retesting. A possible motion to vacate or for new trial based on the results of such testing is not yet at issue. As will be explained further below, we conclude that the Act mandates Pratt be given the opportunity to retest the biological materials pertinent to his convictions. Pratt was convicted before the advent of DNA testing, and the evidence against him consisted of eyewitness testimony and other circumstantial evidence. He presented uncontroverted evidence that the biological evidence can now be retested with more accurate current techniques which may exclude Pratt as the contributor of possible semen on the shirts and identify the true perpetrator. We conclude that the three prongs of § 29-4120(5) were met.

TESTING EFFECTIVELY
NOT AVAILABLE

The district court found in favor of Pratt under prong one of § 29-4120(5), that the testing he requested was effectively not available at the time of trial. The Court of Appeals addressed the merits of this prong, affirming the district court's finding with additional requirements, which the Court of Appeals concluded Pratt had met as a matter of law. The State did not cross-appeal the district court's finding on prong one. To the

---

[17] *Id*.

[18] § 29-4123(3).

[19] See *State v. Buckman*, 267 Neb. 505, 675 N.W.2d 372 (2004).

[20] *Id*.

extent that the State properly assigns as error the Court of Appeals' conclusion as to prong one, that issue was waived by the State's failure to cross-appeal.

Proceedings under the Act are civil in nature.[21] Although the State has only a limited right to appeal in a criminal case, there are no such restrictions under the Act. Thus, as in any other civil proceeding, the State must cross-appeal in order for this court to consider any argument that a lower court's decision should be upheld on grounds specifically rejected below.[22]

PHYSICAL INTEGRITY

The court determined that prong two of § 29-4120(5), that "the biological material has been retained under circumstances likely to safeguard the integrity of its original physical composition," was not demonstrated. Because the uncontroverted evidence presented at the hearing was to the contrary, the district court clearly erred in this determination.

The State argues that Pratt failed to sustain his burden to prove that the biological evidence tested in 2005 still exists and has been maintained since 2005 in a way likely to safeguard its "integrity." While we would agree that total destruction of the evidence would mean its physical "integrity" was not safeguarded, we disagree with the State that Pratt had the burden to provide evidence over which the State, not Pratt, has particular knowledge and control.

[5] The general burden of proof is usually upon the party seeking affirmative relief.[23] Nevertheless, it is an equally fundamental proposition that the burden to produce evidence will rest upon the party who does not have the general burden of proof if that party possesses positive and complete knowledge concerning the existence of facts which the party having that burden is called upon to negative, or if the evidence to prove a fact is chiefly within the party's control.[24]

---

[21] See, e.g., *State v. Pratt*, 273 Neb. 817, 733 N.W.2d 868 (2007).

[22] See *Weber v. Gas 'N Shop*, 278 Neb. 49, 767 N.W.2d 746 (2009).

[23] See, e.g., *State v. Malcom*, 12 Neb. App. 432, 675 N.W.2d 728 (2004).

[24] See *State ex rel. Wagner v. Amwest Surety Ins. Co.*, 274 Neb. 121, 738 N.W.2d 813 (2007).

Since 2001, § 29-4125 mandates that the State shall "preserve" any biological material secured in connection with a criminal case for such period of time as any person remains incarcerated in connection with that case. The biological evidence tested in 2005 was in the State's custody from the time it was collected as evidence of the crimes. It was given to UNMC for testing. UNMC is a State entity and was employed by the State to conduct testing. Furthermore, the technologist testified that, after testing, the remaining stained pieces of fabric from the victims' shirts should have been returned to the State's custody with the rest of the evidence.

Other courts reason that it is only logical that the state, as the custodian of the evidence, has the burden to establish whether the requested biological evidence still exists and is available for testing.[25] We agree. It cannot be the inmate's burden to demonstrate how the evidence was retained by the State while that evidence was in the State's custody. Facts pertaining to the State's safeguarding of the evidence while in its custody are chiefly within the State's knowledge and control.

In addition, the Act specifically requires that upon an inmate's motion for testing, the State must file an "inventory of all evidence that was secured by the state."[26] This, in essence, codifies the burden of proof to be on the State. Here, § 29-4120(4) requires that the State demonstrate that the biological evidence that existed in 2005 was not consumed in testing or otherwise destroyed. An "inventory" of things "secured" logically indicates a list of the things the State still has, not just the things once collected but not retained.

The State failed to produce an updated inventory upon Pratt's 2011 motion. Upon remand, we direct the State to file an inventory as required under § 29-4120(4). In the event that the biological evidence no longer exists, as the State argues may be the case, obviously it cannot be tested. However, Pratt is not required by the Act to somehow prove either that the evidence still exists, that it is still in the State's possession,

---

[25] See, *Blake v. State*, 395 Md. 213, 909 A.2d 1020 (2006); *People v. Pitts*, 4 N.Y.3d 303, 828 N.E.2d 67, 795 N.Y.S.2d 151 (2005).

[26] § 29-4120(4).

or that it was retained properly while in the State's custody and during the time that the State had the statutory duty to preserve it.

As for the status of those biological materials before the State's statutory duty to safeguard them arose in 2001, we must address the meaning of prong two's "integrity" language. This is the first occasion we have had to do so.

It is undisputed that the shirts were stored in a cardboard box and probably handled by various persons during the course of the trial. The State believes that the possibility of extraneous DNA from epithelial cells being deposited onto the evidence during storage and handling relates to the "integrity" of the "original physical composition" of the relevant "biological material[s]."[27] The Court of Appeals, in its opinion below, accepted that assumption. We conclude that the possibility of extraneous DNA being deposited on the evidence instead relates to whether the requested DNA testing may lead to exculpatory evidence—whether any DNA found will have a bearing on the guilt or culpability of Pratt. That is prong three.

Dictionaries define "integrity" as the state of being unmarred, unimpaired, complete, undivided, whole, unified, or sound in construction.[28] The integrity at issue under § 29-4120(5) is that of the "original physical composition" of "the biological material." Since this is a DNA testing statute, the relevant "biological material[s]" are, fundamentally, the DNA. The question under the physical integrity prong thus is whether the evidence has been retained in a manner "likely" to avoid impairment of the original physical integrity of any DNA deposited during the crime or otherwise relevant to the crime.

No other state or federal DNA statute utilizes this "integrity" language. Most statutes do, however, require a finding that the evidence was subjected to a "chain of custody" sufficient

[27] § 29-4120(5).

[28] See, Concise Oxford American Dictionary 466 (2006); Merriam Webster's Collegiate Dictionary 608 (10th ed. 1996); Webster's Third New International Dictionary of the English Language, Unabridged 1174 (1993).

to establish that it has not been "substituted, tampered with, replaced or altered in any material aspect."[29] Some statutes and cases describe this absence of substituting, tampering, replacing, or altering, as the overall "integrity" of the evidence.[30] We find that to be an apt characterization of the meaning of "integrity" in the context of DNA evidence.

In determining that prong two was not met, the district court relied exclusively on the fact that the shirts had been stored in a cardboard box together with Pratt's clothing and that they had apparently been touched by jurors, attorneys, court employees, and other employees who would have reason to be in contact with the evidence. But this incautious storage and handling indicate that extraneous DNA may have been added to the shirts, not necessarily that the integrity of the original physical composition of the relevant DNA has been somehow compromised. In fact, all the evidence before the court indicated that the "integrity" of the biological evidence was not materially affected by the storage and handling of the evidence.

Despite any mixtures with extraneous DNA or with the victims' DNA, and with knowledge of the past storage and handling of the shirts, Wraxall averred that a partial or full profile of the perpetrator's DNA could still be obtained. The State presented no expert testimony to the contrary. Despite testimony that storing clothing in a cardboard box is no longer

---

[29] Cal. Penal Code § 1405(f)(2) (West 2011). Accord, Ark. Code Ann. § 16-112-202(4) (2006); D.C. Code § 22-4133(a)(2) (Supp. 2009); Idaho Code Ann. § 19-4902(c)(2) (2004); 725 Ill. Comp. Stat. Ann. § 5/116-3(b)(2) (LexisNexis Cum. Supp. 2009); Me. Rev. Stat. Ann. tit. 15, § 2138(4)(C) (West 2003); Minn. Stat. § 590.01(1a)(1)(b)(2) (2012); N.J. Stat. Ann. § 2A:84A-32a(d)(2) (West 2011); Tex. Crim. Proc. Code Ann. § 64.03(a)(1)(A)(i) and (ii) (West 2013). See, also, Del. Code Ann. tit. 11, § 4504(a)(4) (2007); Fla. Stat. Ann. § 925.11(2)(f)(2) (West Cum. Supp. 2014); Ind. Code Ann. § 35-38-7-8(2)(B) (LexisNexis Cum. Supp. 2009); Md. Code Ann., Crim. Proc. § 8-201 (LexisNexis Cum. Supp. 2009); Utah Code Ann. § 78B-9-301(2)(a) and (b) (LexisNexis 2012); Va. Code Ann. § 19.2-327.1(A)(ii) (2008).

[30] See, Miss. Code. Ann. § 99-39-9(1)(d) (Supp. 2013); S.C. Code Ann. § 17-28-70(E) (Cum. Supp. 2011); *People v. Urioste*, 316 Ill. App. 3d 307, 736 N.E.2d 706, 249 Ill. Dec. 512 (2000).

considered "appropriate," there is no evidence in the record from either this motion or the prior proceedings upon Pratt's 2007 motion to vacate or for new trial, that the perpetrator's DNA, if deposited, has since decomposed or otherwise had its physical composition marred, substituted, tampered with, replaced, or altered as a result of the inappropriate storage and handling. Thus, the district court clearly erred in its determination that the biological material has not been retained under circumstances likely to safeguard the integrity of its original physical composition.

If we were to interpret the physical integrity prong as demanding that the biological evidence was secured in a way likely to avoid accidental contamination with extraneous DNA from epithelial cells, then the express purposes of the Act would be undermined. We have no reason to believe that storing items of evidence containing biological materials in a cardboard box or allowing jurors and attorneys to handle that evidence was anything other than accepted and commonplace before the advent of DNA testing. As the district court noted in its 2008 order, there was no awareness at the time of Pratt's trial that handling the shirts could "contaminate" them for future scientific testing. Yet, the legislative findings of the Act specifically state its purpose is to test evidence originally retained during this period of ignorance of optimal retention standards for biological materials. The Act states that DNA testing is "often feasible on relevant biological material that is decades old."[31] The physical integrity prong of the Act clearly was not drafted to prevent discovery of relevant exculpatory DNA evidence simply because the evidence was not stored or handled in a manner comporting with current scientific knowledge and standards.

Finally, we note that the district court reasoned that it had "already determined that the materials to be tested were not maintained under circumstances likely to safeguard the integrity of their original composition, and the Supreme Court affirmed that finding." That is not entirely accurate. The district court utilized the language of § 29-4120(5) (for determinations

---

[31] § 29-4118(4).

upon which testing must be ordered) when it considered Pratt's 2007 motion to vacate or for new trial based upon the 2005 test results. But the only statutory inquiry upon a motion to vacate or for new trial under the Act is whether the DNA evidence "exonerate[s]" or "exculpate[s]" the inmate.[32] As Pratt points out, when the prong of physical integrity was squarely before the district court, i.e., when considering whether to grant Pratt's motion for DNA testing in 2005, the district court necessarily found that the biological evidence had been retained under circumstances likely to safeguard the integrity of its original physical composition.

We admittedly parroted the "integrity" language of the district court's 2008 order in our opinion affirming the denial of Pratt's motion to vacate or for new trial, which was based on the 2005 test results.[33] Our reasoning, however, was that the evidence was not exculpatory. This was also essentially the reasoning of the district court in 2008. The presence of another male's DNA on the victims' shirts did not exonerate or exculpate Pratt because the testing conducted in 2005 could not reveal if the DNA was from semen cells or epithelial cells, and the shirts had apparently been handled by several people. The technologist testified that such handling could account for the concentration of male DNA found on the shirts.

### EXCULPATORY EVIDENCE

The retesting Pratt now requests can distinguish between semen cells and epithelial cells. We have explained that the determination under prong three, whether the evidence "may" produce noncumulative, exculpatory evidence, is a "relatively undemanding" standard and "will generally preclude testing only where the evidence at issue would have no bearing on the guilt or culpability of the movant."[34] The Act defines "exculpatory" as "evidence which is favorable to the person

---

[32] § 29-4123(2).

[33] See *State v. Pratt, supra* note 4.

[34] *State v. Buckman, supra* note 19, 267 Neb. at 515, 675 N.W.2d at 381. See, also, e.g., *State v. Lotter*, 266 Neb. 758, 669 N.W.2d 438 (2003).

in custody and material to the issue of the guilt of the person in custody."[35] The district court clearly erred in determining that test results that could identify another male's semen on the victims' clothing would have no bearing on Pratt's guilt or culpability.

In *State v. White*[36] and *State v. Winslow*,[37] we similarly held that the district court abused its discretion when it denied the inmates' request for DNA testing of the semen samples found at the scene of crimes, which included rape. We said that a possible DNA test result that excluded the defendants as contributors to the semen samples "may be exculpatory" when the State's theory was that only the defendants raped the victim.[38]

The district court's reasoning setting forth the amount of evidence against Pratt at his original trial and stating that additional DNA testing would create "only another circumstance on which Pratt cou[ld] argue reasonable doubt" reflects an improper inquiry. If DNA testing may produce evidence upon which Pratt could argue reasonable doubt about whether he was the rapist, by definition, such evidence may have a bearing upon his guilt or culpability.

We already know from the 2005 testing that at least one other male's DNA is on the victims' shirts. If, for example, that male's DNA is identified as coming from semen, then that would bear upon Pratt's guilt or culpability. Whether such evidence—if found—ultimately should be deemed exonerating or exculpatory would be determined upon a motion to vacate or for new trial and after a hearing on such motion. At that time, the court could explore the likelihood that the semen sample could have been the result of contamination during storage. The presence or absence of a full profile, as Wraxall believes it is now possible to obtain, may be relevant to that inquiry.

---

[35] § 29-4119.

[36] *State v. White*, 274 Neb. 419, 740 N.W.2d 801 (2007).

[37] *State v. Winslow*, 274 Neb. 427, 740 N.W.2d 794 (2007).

[38] See, *id*.; *State v. White, supra* note 36.

The theory of the prosecution at Pratt's trial was that a single perpetrator committed the rape and sodomy of the two victims. The perpetrator ejaculated, and the rape victim was wearing the torn shirt during the rape. The perpetrator repeatedly rummaged through the victims' clothing. Retesting can distinguish between semen cells and epithelial cells. Indisputably, the requested retesting "may" lead to exculpatory evidence.

## CONCLUSION

Pratt was convicted through eyewitness identification testimony and circumstantial evidence. The Legislature has declared that "DNA testing responds to serious concerns regarding wrongful convictions, especially those arising out of mistaken eyewitness identification testimony."[39] We affirm the judgment of the Court of Appeals to the effect that the district court abused its discretion in denying Pratt's motion to retest the biological materials on the victims' shirts. Upon remand, the State shall file an inventory indicating the continued existence and location of the biological materials in question.

AFFIRMED.

CASSEL, J., not participating.

_____

[39] § 29-4118(6).

HEAVICAN, C.J., dissenting.

I respectfully dissent. I cannot find that the district court clearly erred in determining that the materials to be tested were not maintained under circumstances likely to safeguard the integrity of their original composition. Thus, I would affirm the decision of the district court.

## BURDEN OF PROOF

The majority concludes that the State has the burden of proving whether the material requested for testing still exists and whether it has been maintained in a way likely to safeguard its integrity as required by the second prong of Neb. Rev. Stat. § 29-4120(5) (Reissue 2008).

Other jurisdictions have clearly placed the burden of pleading and proving all elements of a statutory right to DNA testing, including chain of custody, on the petitioner.[1] Alternatively, some states require the inmate to make a prima facie showing that the chain of custody has been satisfactory and then shift the burden to the State to prove otherwise.[2] I find these approaches to be more consistent with our previous cases placing the burden of proof on the party seeking postconviction relief.[3] Even under the majority's approach, however, the evidence in this case was sufficient to prove by a preponderance of the evidence that the materials to be tested were not maintained under circumstances likely to safeguard their integrity. The district court made such a finding, and we previously agreed.[4]

## PHYSICAL INTEGRITY

As the majority opinion notes, "It is undisputed that the shirts were stored in a cardboard box and probably handled by various persons during the course of the trial." Nevertheless, the majority concludes that the risk of extraneous DNA relates not to the physical integrity of the material, but, rather, to whether the requested DNA testing may lead to exculpatory evidence. This conclusion is inconsistent with *State v. Phelps*,[5] in which we held that it was not clearly erroneous for the court to determine clothing had not been safeguarded for the purposes of DNA testing where the clothing had been exposed to weather and potentially to wildlife prior to being found,

---

[1] See *State ex rel. Richey v. Hill*, 216 W. Va. 155, 603 S.E.2d 177 (2004). See, also, Mo. Rev. Stat. § 547.035(6) (West 2002); N.M. Stat. Ann. § 31-1A-2(C) (Cum. Supp. 2008); Utah Code Ann. § 78B-9-301(2)(a) and (b) (LexisNexis 2012).

[2] See, e.g., Del. Code Ann. tit. 11, § 4504 (2007); 725 Ill. Comp. Stat. Ann. § 5/116-3 (LexisNexis Cum. Supp. 2009); Mont. Code Ann. § 46-21-110 (2007).

[3] See *State v. Phillips*, 186 Neb. 547, 184 N.W.2d 639 (1971).

[4] See *State v. Pratt*, 277 Neb. 887, 766 N.W.2d 111 (2009).

[5] *State v. Phelps*, 273 Neb. 36, 41, 727 N.W.2d 224, 228 (2007).

and had later been "handled by numerous persons during the investigation and at trial."

The majority opinion also notes that while statutes in other jurisdictions do not utilize the "integrity" language, most require a finding that the evidence was maintained with a proper "'chain of custody.'" The majority describes this as requiring that the evidence has not been "'substituted, tampered with, replaced or altered in any material aspect.'" However, another word found frequently in the description of proper chain of custody required by statutes of other jurisdictions is "contaminated."[6] In this case, while the physical integrity of the materials to be tested has been maintained in the sense that the shirts have not decomposed or been replaced, the shirts have been contaminated by frequent handling and storage with other evidence.

In his second motion for DNA testing, Pratt alleges that the testing techniques proposed by Brian Wraxall, the forensic serologist, are more effective at determining whether the source of the DNA is semen or epithelial cells. Under the facts of this case, I do not believe this changes the physical integrity analysis. Presumptive testing for the presence of semen has already been performed on the clothing, and the results were negative. Even if new testing revealed the presence of a previously undetected, minute amount of semen, the frequent handling by numerous individuals means we could only speculate when or how the semen was deposited on the clothing. The failure to maintain the evidence under circumstances likely to safeguard its integrity negates any assumption that extraneous DNA found on the clothing must be from the perpetrator of the crime.

For the foregoing reasons, I cannot find that the district court clearly erred, and I would affirm.

---

[6] See, e.g., 18 U.S.C. § 3600(a)(4) (2012); Del. Code Ann. tit. 11, § 4504(a)(4); Mont. Code Ann. § 46-21-110(1)(b).