Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
11/09/2017 09:14 AM CST

State of Nebraska, appellee, v.
Randall R. Robbins, appellant.

___ N.W.2d ___

Filed August 18, 2017.    No. S-16-155.

1. **DNA Testing: Appeal and Error.** A motion for DNA testing is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed.

2. **Motions to Vacate: Motions for New Trial: DNA Testing: Appeal and Error.** Under the DNA Testing Act, an appellate court will not reverse a trial court's order determining a motion to vacate a judgment of conviction or grant a new trial absent an abuse of the trial court's discretion.

3. **DNA Testing: Appeal and Error.** Under the DNA Testing Act, an appellate court will uphold a trial court's findings of fact unless such findings are clearly erroneous.

4. **Statutes: Appeal and Error.** Statutory interpretation is a question of law that an appellate court resolves independently of the trial court.

5. **Appeal and Error.** Absent plain error, assignments of error not discussed in the briefs will not be addressed by an appellate court.

6. **Appeal and Error: Words and Phrases.** Plain error exists where there is an error, plainly evident from the record but not complained of at trial, which prejudicially affects a substantial right of a litigant and is of such a nature that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process.

7. **Statutes: Legislature: Intent: Appeal and Error.** In construing a statute, an appellate court should consider the statute's plain meaning in pari materia and from its language as a whole to determine the intent of the Legislature.

8. ____: ____: ____: ____. In construing a statute, an appellate court's objective is to determine and give effect to the legislative intent of the enactment.

9. **Appeal and Error.** Plain error may be asserted for the first time on appeal or be noted by an appellate court on its own motion.

10. **Final Orders: Appeal and Error.** A substantial right is affected if an order affects the subject matter of the litigation, such as diminishing a claim or defense that was available to the appellant before the order from which he or she is appealing.

Appeal from the District Court for Lancaster County: STEVEN D. BURNS, Judge. Reversed and remanded with directions to dismiss.

Robert W. Kortus, of Nebraska Commission on Public Advocacy, for appellant.

Douglas J. Peterson, Attorney General, and Erin E. Tangeman for appellee.

HEAVICAN, C.J., WRIGHT, MILLER-LERMAN, CASSEL, STACY, KELCH, and FUNKE, JJ.

HEAVICAN, C.J.

## I. INTRODUCTION

In 2003, Randall R. Robbins was sentenced to a period of 40 to 60 years' incarceration for second degree murder for the strangulation death of his girlfriend, Brittany Eurek.

On September 4, 2012, Robbins filed a motion in the district court requesting (1) postconviction relief pursuant to Neb. Rev. Stat. § 29-3001 et seq. (Reissue 2016), (2) a new trial based on newly discovered evidence pursuant to Neb. Rev. Stat. § 29-2101(5) (Reissue 2016), and (3) a new trial based on DNA testing pursuant to § 29-2101(6). The district court denied Robbins' request for postconviction relief as time barred and denied Robbins' request for a new trial under § 29-2101(5), because it was filed more than 3 years after Robbins' conviction. The district court granted Robbins' request for DNA testing. Robbins received pharmacogenetic testing, via a buccal swab, which indicated that he was an "intermediate metabolizer" of prescription drugs.

Based on these results, Robbins asserted that while the dosage of the Zoloft medication he was taking at the time

of the murder was the recommended amount for the average metabolizer, the dosage was too high for his body to properly metabolize. Robbins claims that this resulted in his experiencing a side effect, which caused him to be violent and homicidal.

Robbins therefore argued that he was entitled to relief under the DNA Testing Act (Act), Neb. Rev. Stat. § 29-4116 et seq. (Reissue 2008), because new scientific evidence could contribute to and establish defenses at trial of an inability to formulate intent, intoxication, or insanity. Following an evidentiary hearing, the district court denied Robbins' motion for new trial or new sentencing hearing based on the pharmacogenetic testing results. Robbins appeals. We hold that the district court committed plain error in granting Robbins' motion for DNA testing. We reverse, and remand with directions to dismiss.

## II. BACKGROUND

### 1. Factual Background

#### (a) Zoloft Prescription

On March 26, 2002, Dr. Richard Wurtz, a family practitioner, gave Robbins a standard trial dosage of Zoloft, 50 mg per day (14 pills), for Robbins' anxiety and told Robbins to follow up with him in 2 weeks. The trial dosage included product information. Wurtz testified that he did not give Robbins a prescription for Zoloft and that 50 mg is a standard starting dosage.

There is no evidence that Robbins followed up with Wurtz or that Robbins ever filled a Zoloft prescription written by Wurtz. However, Robbins testified that at the time of the homicide, he was routinely taking one 50-mg tablet of Zoloft each day. The record is not clear as to how Robbins received the Zoloft without a prescription. Robbins testified that he did not take Zoloft the day of the homicide because he did not take Zoloft when he drank alcohol, and he was planning to drink alcohol that day.

### (b) Strangulation of Eurek

On June 1, 2002, Robbins, a 17-year-old just shy of his 18th birthday, was watching a movie at his residence with Eurek, with whom he had a 6-month old child. Shortly thereafter, they had sexual intercourse in Robbins' bedroom. During intercourse, Eurek told Robbins that she wanted to have another child. Robbins said he did not want to have another child with her. Eurek became angry with Robbins and said that she did not want to have sex with him. They stopped having sex, and Eurek began accusing Robbins of cheating on her.

Robbins "grabbed her by her throat and told her to stop," and Eurek punched Robbins in the face. Robbins came from behind Eurek, again grabbed her by the throat, and began to strangle her with his hands. Eurek then passed out on the floor. Robbins retrieved a belt from his dresser and put it around Eurek's neck, "pulled it up," and "just sat there." About 5 minutes later, he "pulled [Eurek] over and tied her to the rail that goes downstairs." Eurek "was like turning purple," and Robbins stated he tied her to the stair rail "to make sure that she was dead." Robbins later stated that the belt he used was the belt he had used a couple of weeks earlier to attempt suicide.

Robbins then drove Eurek's vehicle to his mother's residence and told his mother that he killed Eurek. Robbins' mother arrived at Robbins' residence, found Eurek's body, and called the 911 emergency dispatch service.

Robbins admitted to the deputies at the scene that he killed Eurek. Following his arrest, Robbins recounted the events in a statement to an investigator. During Robbins' confession to the investigator, he stated that the marks on his neck were scratches from when Eurek was "reaching back trying to make me stop." Robbins also expressed concern that he did not take Zoloft that day. When asked by the investigator whether taking his Zoloft made him feel bad, he answered:

> I don't feel right I can tell you that much since I've been taking it today I don't feel like I should. Usually I feel like I got . . . I don't know I don't know if it's a

problem or what I always have things on my mind caus-
ing things on my mind.

### (c) Robbins' Behavior on Zoloft

Following his arrest, Robbins continued to take Zoloft while
at the juvenile detention center. There was evidence that while
at the juvenile detention center, Robbins' dose was doubled
without any ill effects. Also while at the juvenile detention
center, a psychiatrist hired by Robbins' trial counsel evaluated
Robbins and concluded that Robbins was competent to stand
trial and was not insane at the time of the homicide.

In a deposition taken July 21, 2015, Robbins testified that
when he started taking Zoloft, he felt like he had to be mov-
ing all the time, which "progressed into agitation." Robbins
also testified that his agitation and aggression increased about
3 or 4 weeks after starting Zoloft. Robbins indicated that his
mother called Wurtz about the changes in his behavior prior to
the homicide. Wurtz testified that there was no record of a call
from Robbins' mother.

Trial counsel was deposed. In the deposition, counsel testi-
fied contrary to Robbins' assertions regarding Zoloft's causing
agitation. Trial counsel indicated that Robbins described Zoloft
as calming him down and wondered whether not taking Zoloft
on the day of the homicide caused Robbins to be more agi-
tated. In a July 2, 2002, transcribed statement to trial counsel,
Robbins told him that Zoloft improved his mental state and that
he "was never upset and never sad or down" but that when he
did not take Zoloft, he was "more emotional" and would "get
all upset."

Robbins also alleges two suicidal episodes. One episode
occurred a couple of years before Robbins was placed on
Zoloft; the other occurred a couple of weeks prior to the
homicide while Robbins was taking Zoloft. In addition to the
alleged suicide attempts, there were two other episodes of
physical aggression by Robbins, which the district court found
occurred when he was not taking Zoloft.

(d) Robbins' Pharmacogenetic
Testing Results

Pharmacogenetic testing to determine the ability of a particular person to metabolize a medication was approved by the Food and Drug Administration for commercial use in December 2004. The test was administered to Robbins via a buccal swab, and the swab was sent to an accredited DNA parentage testing group. It is unclear from the record who administered the test. The district court used the terms "genetic testing," "DNA testing," and "pharmacogenetic testing" interchangeably in reference to the test given to Robbins pursuant to its order.

According to Dr. Daniel Hilleman, a pharmacist, there are four main categories of metabolizing Zoloft: extensive metabolizer, intermediate metabolizer, poor metabolizer, and "ultra-rapid" metabolizer. According to the testing group's document explaining the categories, for an individual who tests as an intermediate metabolizer, "[t]his means that you have only one of two operating pathways, and will need a lower than normal dosage and need to carefully monitor medication."

Robbins' pharmacogenetic test results showed that he was an intermediate metabolizer. The test results stated that this had a "[m]ajor" clinical impact and that a prescriber should "consider less than standard dosage to prevent adverse effects" in an intermediate metabolizer.

Hilleman testified that Zoloft was one of the drugs affected by the enzyme measured in the test. Hilleman explained that the reduced ability to metabolize in an intermediate metabolizer meant that "the amount of drug in the body would be increased because the amount of drug that's being detoxified would be relatively less than someone that had full metabolic capacity." Hilleman also stated that according to the FDA-approved labeling, the side effects of Zoloft in major depressive disorders that occurred with rates greater than 10 percent included "dry mouth, somnolence, dizziness, diarrhea, nausea, [and] insomnia."

### (e) Zoloft Black Box Warning

Hilleman testified that a "black box warning" is "an insert within the formal prescribing information that the Food and Drug Administration mandates be included when a significant risk with a particular drug exists" and that such warnings were not available to treating physicians, psychiatrists, or pharmacologists prior to 2004.

The black box warning for Zoloft states in relevant part: "Antidepressants increased the risk compared to placebo of suicidal thinking and behavior (suicidality) in children, adolescents, and young adults in short-term studies of major depressive disorder (MDD) and other psychiatric disorders. . . . Depression and certain other psychiatric disorders are themselves associated with increases in the risk of suicide."

The black box warning states that suicidal thoughts and behavior were adverse reactions most common in children, adolescents, and young adults. Hilleman stated that he agreed with the black box warning, and he also connected Zoloft with violent behavior, because "there are some additional independent reports in the medical literature that have documented an association between the use of antidepressants and violent behavior." Hilleman also testified that "most of the adverse reaction reports were suicide attempts" but that there were also reports of homicide attempts. Hilleman explained that the inability to metabolize Zoloft could result in such adverse reactions because

> [t]he abnormality in the functioning of the CYP2C19 enzyme could have led to higher amounts of drug in a patient, and then a greater effect in that patient in terms of adverse reactions of which one is suicidal ideation and/or behavior, and according to the report that I cited from [a research journal article] which associates reports of violence towards others, with antidepressants, could have led to an increase in violent tendency towards others.

Walter Duffy, a psychiatrist who evaluated Robbins due to truancy and alcohol and cannabis dependence in early 2002,

was an expert for the State and testified by deposition that pharmacogenetic testing "is a tool. It is not a bull's eye." Duffy testified that in his practice, he more often evaluates the results and side effects experienced by the patient and adjusts the medicine or dosage accordingly, rather than resort to pharmacogenetic testing.

Robbins' trial counsel testified that knowledge of the DNA results "might very well have affected what I did at sentencing or how I negotiated with the county attorney, what information I provided to the county attorney." The district court found that "neither Dr. Hilleman nor Dr. Duffy made a causal connection between [Robbins'] being an intermediate metabolizer of Zoloft and suicidal or homicidal side effects." In addition, the court found that neither doctor observed any side effects experienced by Robbins or made a causal link between consumption of Zoloft and the homicide committed by Robbins.

The district court further found that according to Hilleman, "[o]ne of the effects of higher amounts of the drug reaching the brain is a greater potential for adverse side effects such as suicidal ideation . . . ." However, the court found that "no studies were identified by the experts that differentiated between the four categories of metabolizers regarding whether one category is more likely to have suicidal ideation or homicidal thoughts compared to the others."

## 2. PROCEDURAL BACKGROUND

Robbins was initially charged with first degree murder. He subsequently entered a plea of guilty to a reduced charge of second degree murder. On April 24, 2003, Robbins was sentenced to a period of 40 to 60 years' incarceration. Robbins appealed from his conviction and sentencing. The Nebraska Court of Appeals affirmed Robbins' conviction and sentence.[1]

On May 20, 2011, Robbins, acting pro se, filed a motion to compel the Nebraska Department of Correctional Services to

---

[1] See *State v. Robbins*, 12 Neb. App. xxxix (No. A-03-500, Sept. 15, 2003).

allow him to take a DNA drug reaction profile test. On May 23, the district court overruled Robbins' motion to compel because there was no pending postconviction proceeding.

On September 4, 2012, Robbins, still acting pro se, filed a motion in the district court requesting (1) postconviction relief pursuant to § 29-3001 et seq., (2) a new trial based on newly discovered evidence pursuant to § 29-2101(5), and (3) a new trial based on DNA testing pursuant to § 29-2101(6).

On September 24, 2012, the State filed a motion to dismiss Robbins' motion for postconviction relief. On November 21, following a hearing, the court filed an order (1) denying Robbins' request for postconviction relief as time barred, (2) denying Robbins' request for a new trial under § 29-2101(5), and (3) granting Robbins' request for DNA testing under § 29-4120(5).

The court found that Robbins' allegation met the standard set forth in § 29-4120(5), that DNA testing may be relevant to the claim that a person was wrongfully convicted or sentenced. Pursuant to § 29-4122, the court appointed counsel to represent Robbins' claim under the Act. On January 14, 2013, Robbins' court-appointed attorney was allowed to withdraw and the Nebraska Commission on Public Advocacy was appointed. Robbins apparently separately appealed from the denial of postconviction relief, and the Court of Appeals affirmed the district court's judgment, finding that Robbins' motion was untimely filed.[2]

On January 28, 2016, following a hearing, the district court overruled and dismissed Robbins' motion for DNA testing. The court held that (1) the DNA evidence did not show a complete lack of evidence to establish any element of the crime charged, thus Robbins was not entitled to a finding of complete exoneration; (2) the absence of DNA evidence did not affect a substantial right of Robbins, nor would it probably have produced a substantially different result, thus Robbins

---

[2] See *State v. Robbins*, 21 Neb. App. xxv (No. A-12-1158, Sept. 10, 2013), and *State v. Robbins*, 20 Neb. App. lxii (No. A-13-261, May 15, 2013).

was not entitled to a new trial based on this evidence; and (3) it was not unfair to Robbins that he was sentenced without the court's knowing of his less-than-average metabolization of Zoloft, thus the DNA evidence was not exculpatory, nor did it have any relevance to a claim that Robbins was wrongfully sentenced or convicted.

Shortly after oral arguments, we directed the parties to submit supplemental briefs addressing (1) whether the DNA test utilized by Robbins met the requirements set forth in § 29-4120(1)(b), (2) whether the Act allows testing of this type, and (3) whether the evidence regarding Robbins' status as an intermediate metabolizer is "exculpatory evidence" under §§ 29-4119, 29-4120, and 29-4123.

## III. ASSIGNMENTS OF ERROR

Robbins assigns, restated, that the district court erred in (1) denying a new sentencing and (2) overruling his motion new trial.

## IV. STANDARD OF REVIEW

[1-3] A motion for DNA testing is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed.[3] Under the Act, an appellate court will not reverse a trial court's order determining a motion to vacate a judgment of conviction or grant a new trial absent an abuse of the trial court's discretion.[4] Under the Act, an appellate court will uphold a trial court's findings of fact unless such findings are clearly erroneous.[5]

[4] Statutory interpretation is a question of law that an appellate court resolves independently of the trial court.[6]

---

[3] *State v. Winslow*, 274 Neb. 427, 740 N.W.2d 794 (2007).

[4] *State v. Parmar*, 283 Neb. 247, 808 N.W.2d 623 (2012).

[5] *Id.*

[6] *State v. Thompson*, 294 Neb. 197, 881 N.W.2d 609 (2016).

[5,6] Absent plain error, assignments of error not discussed in the briefs will not be addressed by an appellate court.[7] Plain error exists where there is an error, plainly evident from the record but not complained of at trial, which prejudicially affects a substantial right of a litigant and is of such a nature that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process.[8]

## V. ANALYSIS

Before addressing Robbins' argument that he was entitled to relief under the Act, we must determine whether the Act is applicable and allows the testing sought in this case. Finding that it does not, we must reverse, and remand with directions to dismiss.

In his supplemental brief, Robbins contended that the Act applies to testing of this type because (1) he was in custody at the time the sample for DNA testing was taken from his cheek and has remained in custody since that time, (2) his DNA profile is not subject to change, and (3) the Act does not expressly limit how evidence may be used and, in the alternative, if it may only be used for purposes of determining identity, "[a] person suffering from an involuntary and adverse reaction to medication is a different person."[9]

### 1. Interpretation of Act

[7] We first turn to whether the DNA testing sought by Robbins is the type of DNA testing intended under the Act. In construing a statute, an appellate court should consider the statute's plain meaning in pari materia and from its language as a whole to determine the intent of the Legislature.[10]

---

[7] *State v. Soukharith*, 260 Neb. 478, 618 N.W.2d 409 (2000).

[8] *In re Estate of Morse*, 248 Neb. 896, 540 N.W.2d 131 (1995).

[9] Supplemental brief for appellant at 10.

[10] *State v. Buckman*, 267 Neb. 505, 675 N.W.2d 372 (2004).

Section 29-4120(1)(b) provides guidance. Under § 29-4120(1)(b), a person in custody may request DNA testing of biological material only if the biological material "[i]s in the actual or constructive possession or control of the state or is in the possession or control of others under circumstances likely to safeguard the integrity of the biological material's original physical composition[.]"

Section 29-4120(5) provides further explanation as to the circumstances under which a court may order DNA testing. That section states that the defendant has the burden of providing the district court with affidavits or evidence at a hearing establishing the three required factual determinations for the district court.[11] Subsection (5) also includes a requirement that "the biological material has been retained under circumstances likely to safeguard the integrity of its original physical composition."

In *State v. Pratt*,[12] we explained the "integrity" language in § 29-4120(1)(b) and (5), and we stated:

> The integrity at issue under § 29-4120(5) is that of the "original physical composition" of "the biological material." Since this is a DNA testing statute, the relevant "biological material[s]" are, fundamentally, the DNA. The question under the physical integrity prong thus is whether the evidence has been retained in a manner "likely" to avoid impairment of the original physical integrity of any DNA deposited during the crime or otherwise relevant to the crime.

We further explained:

> No other state or federal DNA statute utilizes this "integrity" language. Most statutes do, however, require a finding that the evidence was subjected to a "chain of custody" sufficient to establish that it has not been "substituted, tampered with, replaced or altered in any

---

[11] See *State v. Young*, 287 Neb. 749, 844 N.W.2d 304 (2014).

[12] *State v. Pratt*, 287 Neb. 455, 469, 842 N.W.2d 800, 810 (2014).

material aspect." Some statutes and cases describe this absence of substituting, tampering, replacing, or altering, as the overall "integrity" of the evidence. We find that to be an apt characterization of the meaning of "integrity" in the context of DNA evidence."[13]

In addition, § 29-4120(4) states that after a motion seeking forensic DNA testing has been filed, the State is required to file "an inventory of all evidence that was secured by the State or a political subdivision in connection with the case." This further implies the nature of the material to be subjected to DNA testing under the Act must be something which can be "inventor[ied]" and "secured by the state or a political subdivision."[14]

[8] To further explain the "integrity" requirement of the Act, we look to its legislative history. In construing a statute, an appellate court's objective is to determine and give effect to the legislative intent of the enactment.[15] According to the legislative history of the Act, the Legislature intended for a defendant to

> be required to present a claim that establishes . . . that the identity of the defendant was a material issue at the trial and that resulted in his or her conviction; that *the evidence to be tested must be in a chain of custody* sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material aspect; and that the results of such testing would be *material to the issue of identity*.[16]

Here, the DNA was acquired from a buccal swab of Robbins' cheek 11 years after the crime to determine how he metabolized pharmaceutical medicines. Unlike the language

---

[13] *Id.* at 469-70, 842 N.W.2d at 810.

[14] § 29-4120(4).

[15] *State v. Hernandez*, 283 Neb. 423, 809 N.W.2d 279 (2012).

[16] Judiciary Committee Hearing, L.B. 659, 97th Leg., 1st Sess. 57 (Feb. 23, 2001) (remarks of Senator Kermit Brashear) (emphasis supplied).

suggested in *Pratt* and set forth in the legislative hearings, a defendant's ability to metabolize pharmaceutical drugs does not have an "original physical composition" that can be in a "chain of custody" or "in the actual or constructive possession or control of the state . . . likely to safeguard [its] integrity."[17] A logical reading of the Act does not allow for a court to grant DNA testing in the form of a buccal swab to determine a defendant's metabolism of pharmaceutical medicines.

## 2. Robbins' DNA Evidence as Exculpatory Evidence

Next, we turn to whether the evidence regarding Robbins' status as an intermediate metabolizer of pharmaceutical drugs is "exculpatory evidence" under §§ 29-4119, 29-4120, and 29-4123. We have held that "the only statutory inquiry upon a motion to vacate or for new trial under the Act is whether the DNA evidence 'exonerate[s]' or 'exculpate[s]' the inmate."[18]

Robbins argues that a person's genetic capacity to metabolize prescription drugs is exculpatory evidence under the Act, because it is favorable to Robbins and "material to the issue of guilt . . . or relevant to a claim that [Robbins] was wrongfully sentenced," as he claims was established by Hilleman's testimony.[19]

Section 29-4123 states that after the receipt of the results of the DNA testing, a party may request a hearing before the court "when such results exonerate or exculpate the person." Section 29-4119 defines exculpatory evidence as "evidence which is favorable to the person in custody and material to the issue of the guilt of the person in custody."

In *State v. Winslow*,[20] this court reversed the district court's denial of the defendant's request for DNA testing and found that DNA testing of the samples of biological material found

---

[17] See § 29-4120(1)(b).

[18] *State v. Pratt, supra* note 12, 287 Neb. at 472, 842 N.W.2d at 812.

[19] Supplemental brief for appellant at 12.

[20] *State v. Winslow, supra* note 3.

at the scene of the crime produced noncumulative, exculpatory evidence. In *Winslow*, the defendant was allegedly part of a group of individuals that broke into the victim's house and raped and murdered her during the course of a failed burglary. This court found that DNA testing would "exclude . . . contributors to the semen sample" and "raise doubts regarding the veracity of the testimony" at the codefendant's trial that "served as the factual basis for [the defendant's] plea and would therefore be favorable" to the defendant.[21] This court reasoned that

> even if [the defendant] were placed at the scene of the crime, such evidence excluding [the defendant] as a contributor would also be relevant to a claim by [the defendant] that he was less culpable than the sentencing court had believed him to be and that therefore, he was wrongfully sentenced.[22]

The Act states that the Legislature finds that DNA testing is "the most reliable forensic technique for *identifying persons* when biological material is found at a crime scene or transferred from the victim to the person responsible and transported from the crime scene."[23] Section 29-4117 states that it is "the intent of the Legislature that wrongfully convicted persons have an opportunity to establish their innocence." Furthermore, in the legislative history of the Act, as stated above, the Legislature explained that its purpose in passing the Act was to allow defendants the opportunity to receive DNA testing that "would be *material to the issue of identity*."[24]

Robbins concedes that "[t]he purpose of genetic testing in this case is not to establish that the results of such testing exonerates or exculpates [him]."[25] Instead, Robbins argues

---

[21] *Id*. at 436, 740 N.W.2d at 801.

[22] *Id.* at 437, 740 N.W.2d at 801.

[23] § 29-4118(1) (emphasis supplied).

[24] Judiciary Committee Hearing, *supra* note 16 at 57 (emphasis supplied).

[25] Brief for appellant at 4-5.

that "[t]he issue is one of culpability viewed through the lense [sic] of sentencing mitigation and/or whether new scientific evidence would contribute to and establish defenses at trial of (a) an inability to formulate intent, (b) intoxication, or (c) insanity."[26]

This case is distinguishable from *Winslow*. Unlike *Winslow*, the DNA testing that Robbins sought does not exclude him from being a contributor to DNA found during the investigation into the underlying homicide. Rather, Robbins admits that he killed Eurek and he does not contend that the DNA testing will exculpate or exonerate him as to his identity as the only contributor in her death. Because the evidence from the DNA testing cannot exclude Robbins as a contributor, the holding in *Winslow* does not control under the current facts.

We find no merit in Robbins' argument that this case involves an issue of identity because he was a "different person" while on Zoloft.[27] There is no issue of identity in this case, and as we established above, the DNA testing was not material to the issue of the guilt of the person in custody or that he was less culpable than the sentencing court had believed him to be and that therefore, he was wrongfully sentenced. Because the Act is intended to assist in proving the innocence of a convicted person through establishing the person's *identity*, it cannot be said that evidence from the DNA testing probably would have produced a substantially different result at trial. As such, the evidence is not exculpatory under the Act.

As this is a question of statutory interpretation, we hold that the Act does not apply to DNA testing of the defendant's person for the purpose of determining the defendant's metabolism of prescription medication. Furthermore, new evidence concerning a defendant's metabolism of prescription drugs, when such evidence has no bearing on identity, is not exculpatory under the Act.

---

[26] *Id.* at 5.

[27] Supplemental brief for appellant at 10.

[9,10] Absent plain error, assignments of error not discussed in the briefs will not be addressed by this court.[28] Plain error exists where there is an error, plainly evident from the record but not complained of at trial, which prejudicially affects a substantial right of a litigant and is of such a nature that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process.[29] Plain error may be asserted for the first time on appeal or be noted by an appellate court on its own motion.[30] A substantial right is affected if an order affects the subject matter of the litigation, such as diminishing a claim or defense that was available to the appellant before the order from which he or she is appealing.[31]

We find that it was "plainly evident from the record" that the DNA testing Robbins sought in his motion for DNA testing was not within the purview of the Act. We further find that to apply the Act to a defendant's metabolism of prescription drugs would extend the Act beyond its purpose set forth by the Legislature and, as such, "damage . . . the integrity, reputation, and fairness of the judicial process."[32] We hold that the district court committed plain error in granting Robbins' motion for DNA testing.

## VI. CONCLUSION

The district court committed plain error in granting Robbins' motion for DNA testing. We reverse, and remand with directions to dismiss.

Reversed and remanded with
directions to dismiss.

---

[28] *State v. Soukharith, supra* note 7.

[29] *In re Estate of Morse, supra* note 8.

[30] *Id.*

[31] *Carmicheal v. Rollins*, 280 Neb. 59, 783 N.W.2d 763 (2010).

[32] *In re Estate of Morse, supra* note 8, 248 Neb. at 897, 540 N.W.2d at 132.